UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
ROBERT P. MILANI, PAYSACH A. BURNES, JASON
M. TSULIS, ALEX BIEN-AIME, SHAWN W. ENG,
MATTHEW C. PLUTA, THOMAS YU, DARREN ZOU,                    **1:25-CV-1732**
AND MENACHEM M. BENSINGER,

                         *Plaintiffs*,

           - against -                                           **COMPLAINT**

NEW YORK CITY,

                                 **JURY TRIAL**
                   *Defendant*.        **DEMANDED**
------------------------------------------------------------------------- X

       Plaintiffs, Robert P. Milani, Paysach A. Burnes, Jason M. Tsulis, Alex Bien-Aime,

Shawn W. Eng, Matthew C. Pluta, Thomas Yu, Darren Zou, and Menachem M. Bensinger, by

and through their attorneys the Law Office of Mirel Fisch, allege the following:

<u>**INTRODUCTORY STATEMENT**</u>

   1.   Plaintiffs bring this action to challenge New York City's unconstitutional policies and

practices of excessive, unreasonable, and unjustifiable delays in processing firearms license

applications, and issuing licenses and Purchase Authorizations to those applicants who were in

fact approved, which deprived Plaintiffs of their Second Amendment rights to keep and bear

arms until such time as they were issued their approved licenses and Purchase Authorizations.

   2.   Despite being placed on notice that its policies and practices violated applicants' Second

Amendment rights and privileges, New York City, through its Police Department's License

Division, failed to take measures to prevent these violations from continuing to occur. The City

thereby evidenced a pattern and practice of deliberate indifference to these ongoing

constitutional violations of applicants' Second Amendment rights, which caused Plaintiffs to be deprived of their Second Amendment rights to keep and bear arms.

## JURISDICTION AND VENUE

3.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Second and Fourteenth Amendments to the United States Constitution. This action also implicates the laws of the State of New York.

4.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

6.    Plaintiff Robert P. Milani ("Milani") is a resident of Suffolk County, State of New York.

7.    Plaintiff Paysach A. Burnes ("Burnes"), is a resident of Kings County, State of New York.

8.    Plaintiff Jason M. Tsulis ("Tsulis") is a resident of New York County, State of New York.

9.    Plaintiff Alex Bien-Aime ("Bien-Aime") is a resident of Kings County, State of New York.

10.    Plaintiff Shawn W. Eng ("Eng") is a resident of Kings County, State of New York.

11.    Plaintiff Matthew C. Pluta ("Pluta") is a resident of New York County, State of New York.

12.    Plaintiff Thomas Yu ("Yu") is a resident of Kings County, State of New York.

13.    Plaintiff Darren Zou ("Zou") is a resident of Queens County, State of New York.

14.    Plaintiff Menachem M. Bensinger ("Bensinger") is a resident of Kings County, State of New York.

15.    Defendant New York City ("New York City" or the "City") is a duly constituted municipality in the State of New York, existing by reason of, and pursuant to, the law of the State of New York. The New York City Police Department ("NYPD"), which is an administrative arm of New York City, and its License Division, are headquartered in New York County, State of New York.

## FACTUAL ALLEGATIONS

### NEW YORK STATE'S REQUIREMENTS TO OBTAIN A FIREARMS LICENSE TO LEGALLY POSSESS A FIREARM WITHIN THE STATE

16.    While the Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms," courts have long recognized that the right is not unfettered, and individual states are permitted to establish certain requirements and restrictions.

17.    Accordingly, individuals seeking to exercise their rights to keep and bear arms must comply with the applicable rules and laws of the various states in which they seek to exercise their Second Amendment rights.

18.    In the State of New York (the "State"), like many other states, individuals must possess a valid firearms license as a prerequisite to exercising their Second Amendment rights.

19.    Handgun licenses are required in order to possess handguns throughout the State. As to rifles and shotguns, however, with one single exception, a firearms license is *not* required throughout the State—a license is only required within City limits.

20.    If individuals possess firearms *without* having obtained valid licenses to do so, they face prosecution for crimes punishable by up to 15 years' imprisonment, and fines of up to $5,000, depending on the particular charge convicted of.

21.    The State, like other states, codified rules setting forth certain application requirements for those seeking to obtain a firearms license within the State. For the general civilian applicant, the applicable rules are codified in Penal Law § 400.00, titled "Licensing and other Provisions Relating to Firearms."

22.    Applications must be submitted to the designated licensing officer in the relevant city or county who determines whether to approve or deny an application. *See id.* §§ 400.00(1) and (3).

23.    Some of the statutory requirements to obtain a firearms license in New York State, on the part of the applicant as well as the licensing officers, are outlined below:

24.    Applicants seeking a new license, or seeking to renew a license, must submit a signed and verified application which contains certain personal and background information to their licensing officer. *See id.* § 400.00(3)(a). In New York City, a firearms license application must be submitted to the NYPD's License Division. Applicants *must* also provide fingerprints. *See id.* § 400.00(4).

25.    The relevant licensing officer *must*, prior to issuing a firearms license, "investigate" the applicant.

26.    The licensing officer must determine that all required documents and statements were submitted and that they are true and that the applicant is not disqualified as a matter of law from receiving a license. *See id.* § 400.00(1).

27.    A list of disqualifying criteria is contained in PL § 400.00(1). These include, but are not limited to, convictions for certain felonies, illicit drug use, involuntary civil or psychiatric commitment, and dishonorable discharge from the military. *See id.*

28.    At first glance, this list of disqualifying criteria may appear to require substantial investigation on the part of the licensing officer, but that is not the case.

29.    PL § 400.00(3) requires applicants to state and verify, as part of the application, "whether or not he or she complies with each requirement for eligibility specified in subdivision one of this section and such other facts as may be required to show the good character, competency and integrity of each person or individual signing the application." And the applicant's verification as to these facts satisfies the *licensing officer's* duty to 'investigate' these criteria.

30.    Additionally, the licensing officer obtains relevant records from the Division of State Police or Division of Criminal Justice Services pertaining to criminal records, and from the appropriate office of the Department of Mental Hygiene pertaining to mental illness. *See id.* § 400.00(4).

31.    To obtain criminal records, the licensing officer *must* take an applicant's fingerprints and then forward them to Albany, where the New York State Division of Criminal Justice runs the prints and cross-checks them for any records. *See id.* Once the records are cross-checked the results are sent back to the licensing officer. *See id.* This process is simpler than it sounds, and results are usually obtained in less than a day. In fact, Penal Law § 400.00(4) mandates that "results of the search shall be forwarded to the investigating officer and shall be made without unnecessary delay." *Id.* And "[u]pon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay." *Id.*

32.    The Penal Law established a six-month hard deadline by which licensing officers must not only issue decisions as to the firearms license application—if the application is approved the licensing officer must also issue the license applied for within that six-month period.

33.    Penal Law § 400.00(4-b) expressly provides as follows:

> Processing of license applications. Applications for licenses shall be accepted for processing by the licensing officer at the time of presentment.  Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer **_shall_** act upon any application for a license pursuant to this section **_within six months of the date of presentment of such an application_** to the appropriate authority. Such delay may only be for good cause and with respect to the applicant.  **_In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for_**.

(emphasis added).

34.    Furthermore, Penal Law § 400.00(15) provides that "**_Any_** violation by any person of any provision of this section is a class A misdemeanor." (emphasis added).

## NEW YORK CITY FIREARMS LICENSE APPLICATION PROCESS

35.    Unlike the rest of the State where a valid carry license issued in one county permits the licensee to carry a handgun[1] in all other counties, the City does not recognize or accept valid carry licenses issued in other counties.

36.    Therefore, to carry a firearm—and therefore exercise Second Amendment rights, within the confines of the City, an individual must possess a valid firearms license issued by the City.[2]

37.    The City issues several types of firearms licenses. The following is a non-exhaustive list:

---

[1] As noted above, a license to carry a rifle or shotgun is not required in the rest of the State.
[2] A City carry license is, however, valid and accepted in the rest of the State.

a. Concealed Carry Handgun License (these application and license numbers begin with "CB").[3] Only New York City residents are eligible for Concealed Carry licenses, and these licenses permit City residents to carry concealed firearms outside the home.

b. Premise Residence Handgun License (these application and license numbers begin with "PR"). Only New York City residents are eligible for Premise Residence licenses, and these licenses permit residents to possess firearms in the home.

c. Special Carry Handgun License (these application and license numbers begin with "SC"). These are concealed carry licenses issued to New York State, but non-City, residents who possess a valid New York State carry license from another New York State county, which forms the basis of the Special Carry application/license. These licenses permit State/non-City residents to carry concealed firearms within the City.

d. Non-Resident Concealed Carry Handgun License (these application and license numbers begin with "NC"). These are concealed carry licenses issued to non-New York State/non-New York City residents, which permits non-residents to carry a concealed firearm within the City.

---

[3] CB initially stood for "Carry Business," when, prior to *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), individuals were required to show a special need—typically related to their business, to qualify for a carry license.

    e.   Rifle/Shotgun Permit (these application and permit numbers begin with "RS").

        They permit both New York City residents and non-residents to possess a loaded

        rifle or shotgun within the City.[4]

38.   In addition to complying with the State requirements codified in Penal Law § 400.00, some of which are outline above, individuals seeking a New York City firearms license must also comply with the City's particular requirements.

39.   The City codified its rules in Article 38 of the Rules of the City of New York (the "Rules" or "RCNY"). Specifically, as relevant here, the rules pertaining to handgun licenses and their applications are contained in Article 38, Chapter 5. And the rules pertaining to Rifle/Shotgun permits and their applications are contained in Article 38, Chapter 3. These Rules were recently updated, and a now-current version of Chapter 5 can be found here:

https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCrules/0-0-0-77275 (last visited, Feb. 20, 2025). And a now-current version of Chapter 3 can be found here:

https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCrules/0-0-0-77077 (last visited, Feb. 20, 2025).

40.   The City designated the NYPD's License Division (the "License Division"), which is overseen by its Deputy Commissioner of Legal Matters, to receive, process, investigate, and act upon firearms license applications.

41.   The License Division is run by the License Division Director, Nicole Bekovich, Esq., and its Commanding Officer, Inspector Hugh M. Bogle, who are final policymakers as it pertains to

---

[4] Non-City residents may transport their unloaded rifles or shotguns through the City without a Rifle/Shotgun Permit, so long as the firearm is unloaded, and both it and the ammunition are secured in separately-locked containers.

firearms license applications, including issuing licenses and Purchase Authorization (addressed

below), and the procedures related thereto.

42.    The License Division's personnel act as the licensing officers noted in PL § 400.00.

43.    Accordingly, as noted above, applicants seeking firearms licenses from the City must

apply to the License Division.

44.    In addition to the Rules, the License Division posted "New Application Instructions"

containing additional application requirements and information. *See generally* Ex. A (Printed

copy of "NYPD License Division New Application Instructions,"

https://licensing.nypdonline.org/new-app-instruction/?AspxAutoDetectCookieSupport=1

(printed Feb. 20, 2024)).

45.    Briefly, the City's application process requires applicants to create an online portal

account with the License Division.

46.    After creating a portal account, applicants must complete the click-through online

application, attach the specified documentation, and submit the required payment.

47.    The click-through on-line application takes an applicant through all questions and

affirmations which the Penal Law requires an applicant to answer and affirm, including those

questions and answers outlined in paragraph 27, above. *See* Ex. B at 1-5 (NYPD License

Division New Application Steps 8-17 of 17 (printed Feb. 27-28, 2024)).[5]

48.    The documents that an applicant is required to submit when first applying are listed in 38

RCNY § 5-05 as to handguns, to some extent in § 3-02 as to rifles and shotguns, and in the New

Application Instructions under the heading "Required Forms/Documents." *See* Ex. A at 4. While

---

[5] As of February 27, 2024, Step 11 of 17 had been a confidentiality request. *See id.* at 6. However, it appears that step was removed on February 28, 2025. *See id.* at 9.

the required list varies slightly depending on which application is being submitted, generally speaking, the following documents are required at the time an application is first submitted:

a.  Recent passport-like photo (to satisfy State photo requirements);

b.  Driver's license (for identity verification);

c.  Passport or birth certificate (for proof of date of birth);

d.  Current utility bill (for proof of residency);

e.  Driver's license/other government identification of the individual agreeing to safeguard the firearm(s) in the event the applicant is unable to;

f.  Affidavit of Co-habitant (this is a one-page fillable form, provided for on the License Division's website, and is only applicable if the applicant resides with others over the age of 18); and

g.  As to concealed carry licenses only, a training certificate (proof of compliance with the 16 hour class + 2 hour practical training requirements).

*See also* Ex. B at 11-12.

49.  Certain documents are *not* initially requested or required when an application is first submitted, such as:

a.  Social security card;

b.  Lifetime DMV abstract (This is easily obtainable online at https://dmv.ny.gov/records/get-my-own-driving-record-abstract (last visited, Feb. 20, 2025). In New York State, the cost is $7 and a pdf of the abstract is provided immediately upon payment online);

c.  Character reference letters (four if applying for a carry license, and two if applying for premise license);

    d.   Interview Questionnaire (this is a fillable nine-page form, but it is *not* available on the License Division's website, and it is *not* mentioned in the Rules *or* the "New Application Instructions"—the License Division emails this form to each applicant individually when they email the applicant advising of the scheduled fingerprinting appointment, or when they email the applicant to advise that fingerprints already on file are being applied to the applicant's current application).[6]

*See id.*

50.    If an applicant happens to know that these documents will be required down the road, they can certainly upload them at the time they submit the application—under the "Additional Documents" tab in Step 12 of 17. *See id.* at 12. But the online application makes no reference to these documents. Therefore, the ordinary applicant who is simply providing the documents and information requested in the application itself would not know that these documents are required. *See id.*

51.    Indeed, later in the application process, when applicants are emailed regarding their fingerprinting appointments, many are told to review a checklist where "[t]here will be documents listed that were not part of the online application."

52.    After an applicant completes the application and attaches their documents, they are redirected from the License Division's website to NYC CityPay to complete the required payment. *See id.* at 18. The application fee for all handgun licenses is $340.00. And the application fee for a Rifle/Shotgun Permit is $140.00.

---

[6] If an applicant previously applied and/or has an active NYPD firearms license for which they were fingerprinted by the NYPD, the applicant is not required to submit fingerprints again.

53.    Once an applicant's payment is processed, an auto-generated receipt is immediately delivered to the applicant via email. *See* Ex. C at 1-2 (examples of generic application documents received in any standard application).

54.    The following is a description of what should be happening next in any handgun license application process. But that has proven not to be the case for hundreds of applicants.

55.    If an applicant pays for the application via credit or debit card, the payment is processed immediately and the application status in the portal is listed as "Submitted."

56.    When the application status is marked "Submitted," the NYPD auto-generates a distinct application number—beginning with CB, PR, SC, NC, RS, and so forth depending on the type of application submitted.

57.    Then, within minutes of the applicant receiving the emailed payment receipt, the NYPD auto-generates an email to the applicant, from the License Division Commanding Officer, Insp. Bogle, titled "Handgun Submitted application" or "Rifle/Shotgun Submitted Application," as relevant. *See id.* at 5-6. This email advises the applicant that the application and payment have been received, identifies the application number, and explains the next step in the process—receiving an email scheduling a fingerprinting appointment. *See id.*

58.    If an applicant pays for the application via eCheck, the application status in the portal is listed as "Awaiting Payment" until the payment is processed by the applicant's bank, *and* until the License Division then applies that payment to the application on their end. The online application advises that payments made via eCheck "will take approximately one week to process." *See* Ex. B at 18.

59.    If an applicant pays for the application via eCheck, then, within minutes of receiving the payment receipt, the applicant receives an email from Insp. Bogle titled "Handgun eCheck

Initiated" or "Rifle/Shotgun eCheck Application Initiated"—as relevant, which confirms that an application was initiated and that payment of the application fee via check was authorized. *See* Ex. C at 3-4.

60.   Once the bank processes, and the NYPD applies, the payment, the application status in the portal is changed from "Awaiting Payment" to "Submitted." The process described in paragraphs 56-57, above, pertaining to applications paid for via credit or debit card, then follows.

61.   At some point after an application enters "Submitted" status, the License Division emails the applicant a fingerprinting location and appointment date. *See id.* at 7-14 (containing several examples of fingerprinting appointment emails).

62.   That email is generally accompanied by a message stating that the application is missing certain required documents that must be submitted.[7] *See id.* For the most part, the body of the email does not indicate what documents are missing. *See id.* Rather, the email has attached thereto a document titled "Handgun License Required Documents Checklist," which, at least in theory,[8] indicates which documents are outstanding. *See id.* The email also has attached thereto a fillable "Interview Questionnaire" - either as an individual attachment or as part of a larger packet. *See id.*[9]

---

[7] If the email is generated by the Handgun Section, it generally, but not always, states that the missing documents must be submitted prior to appearing for the fingerprinting appointment. If the email is generated by the Rifle/Shotgun Section, it generally, but not always, states that the missing documents must be submitted before an investigator begins working on the application.

[8] Indeed, one applicant who had uploaded all documents to the portal at the time he submitted the application, responded to this email advising that all documents were uploaded, and asking to confirm that they were in fact received. On July 5, 2024, at 7:42 AM, PO Lissette Guerrerodeoleo responded via email as follows: "about your docs you probably did upload it. This list it's a general requirements list. I did not go over your file at the time of the appointment. I have to schedule more than 300 people in the weekly basics. However, in the day of the interview we will have an update list." [sic]. And numerous other applicants received a checklist wherein every single item was checked off as still "need[ed]," despite the documents having been previously uploaded to the portal. And indeed, those checklists were accompanied by a note stating that "DURING THE INTERVIEW INVESTIGATOR WILL ADVICED [sic] ABOUT ANY MISSING DOCS."

[9] Upon information and belief, the License Division changed its practice several days before this filing and now requires the Interview Questionnaire to be completed at the fingerprinting appointment.

63.    When an applicant receives this email, it is generally the very first time they are asked to submit their Social Security Card, lifetime DMV abstract, character reference letters, and Interview Questionnaire, as these documents are not requested at the time an application is submitted as explained above.

64.    Fingerprints are submitted either at 1 Police Plaza, where the License Division is headquartered and the Handgun Section is located, or in Queens where the Rifle/Shotgun Section of the License Division is located—depending on which application an applicant submitted first.

65.    Only one set of fingerprints is required. If an applicant applies for both a handgun and rifle/shotgun license, either Section can take the fingerprints. The fingerprints are then applied to all the applicant's applications.

66.    At the fingerprinting appointment, a member of the License Division reviews the applicant's documentation to ensure that all required documents and information were uploaded to the portal. If anything is missing, the License Division employee will advise the applicant of that and ask the applicant to submit the outstanding documents. The applicant is then fingerprinted. If nothing is missing, the License Division employee will generally, but not always, advise the applicant of that fact.

67.    After the applicant is fingerprinted, the application status in the online portal is changed from "Submitted" to "Investigation." This generally occurs on the same day, and within hours, of the applicant being fingerprinted.

68.    If an applicant was previously fingerprinted by the NYPD in connection with a firearms license—if they already have an active license or another pending application, and they are now applying for an additional license, they are not required to submit fingerprints again.

69.    Rather, in lieu of receiving an email scheduling their fingerprinting appointment, the applicant receives a "fee waiver,"[10] and receives an email, generally titled "Fee Waiver Letter/Checklist," advising that their fingerprints already on file are being applied to their current application. *See id.* at 15.

70.    As with the email scheduling the fingerprinting appointment, the Fee Waiver Letter/Checklist email does not expressly indicate which documents are missing from the application, and it merely contains a general reference to reviewing the attached checklist and uploading any missing documents, and has (or, is supposed to have), the "Handgun License Required Documents Checklist," and the "Interview Questionnaire," attached thereto. *See id.*

71.    Upon being issued the Fee Waiver Letter/Checklist email, and at the time the fingerprints on file are applied to the new application, the applicant's status in the online portal is changed from "Submitted" to "Investigation."

72.    After an application status is changed to "Investigation," the application enters the queue to await the assignment of an investigator. Investigators are generally, but not always, Police Officers.

73.    Once assigned, the investigator reviews the application and supporting documents. If any documents or information remain outstanding, the investigator contacts the applicant directly— typically via email, to obtain the missing information.

74.    Upon information and belief, investigators follow a checklist to determine whether any documents or information are outstanding. They also determine whether the application should be approved or denied.

---

[10] Presumably, this refers to the waiving of the fingerprinting fee.

75.    After the investigator determines whether the application should be approved or denied, a supervisor reviews and signs off on the determination.

76.    If the application is approved, the status in the portal is updated from "Investigation" to "Approved."[11]

77.    As to Rifle/Shotgun Permits, if an applicant is approved, the Permit, along with a "Disposition Report – Registration Certificate" is mailed out to them. The applicant can immediately purchase a rifle or shotgun and walk out with that purchase on the same day.

78.    As to handgun licenses, until recently 38 RCNY § 5-07(a) mandated that "[i]f the application is approved the applicant shall receive a 'Notice of Application Approval' at the email address provided in the application."[12] Despite this statutory mandate the License Division expressly refused, absent special circumstances, to email the Notice of Application Approval. Rather, the License Division sent a physical letter by USPS mail, aiming, at least in theory, to have the letter delivered approximately 10 days after the applicant's approval was noted on the portal.

79.    The Notice of Application Approval (also referred to here as an "Approval Notice") is accompanied by a one-page list of instructions directing the applicant as to the final steps to obtain the handgun license.

80.    To purchase a firearm, the applicant must bring the Notice of Application Approval to a Federal Firearms Licensee ("FFL") – the gun shop.

81.    While at the FFL, the applicant must pay for and submit to a federal background check called a NICS check (which stands for "National Instant Criminal Background Check System"),

---

[11] If the application is denied, the portal status is updated from "Investigation" to "Denied," and the applicant receives a "Notice of Disapproval" either via email or mail.

[12] The recent amendment to this Rule is addressed further below.

prior to being permitted to purchase the handgun. While at times there are slight delays, this process typically does not take more than five-to-ten minutes. If approved, the FFL writes the NICS check number on the applicant's Notice of Application Approval, and the FFL may then process the handgun sale. However, the applicant cannot take the handgun from the FFL at that time.

82.    Within 72 hours of purchasing the handgun, the applicant must email the following documents and photos to the License Division's Issuing and Purchase Authorization Unit at DG_LIC-PurchaseOrders@nypd.org: the Notice of Application Approval bearing the NICS check number, the handgun receipt, two colored photos of the handgun—one depicting the entire handgun and one zoomed in on the serial number, proof of a safe ownership such as a receipt, and two colored photos of the safe—one depicting the interior and one depicting the exterior.

83.    The License Division often—but not always, then responds to the above email acknowledging the submission and advising that the license is being processed.

84.    At some point thereafter, the physical license bearing the handgun's serial number, along with a Purchase Authorization (often referred to as a 'pink slip') permitting the applicant to retrieve the handgun from the FFL, is mailed to the applicant's address on file.[13]

85.    A licensee must present both the license and Purchase Authorization expressly identifying their handgun to the FFL in order to retrieve their handgun. If the licensee is missing either document, the FFLs is legally prohibited from releasing the handgun to the applicant.

---

[13] While the Notice of Application Approval states that an "issuing appointment" would be scheduled via email during which the applicant receives the physical license and Purchase Authorization, that is not the case—the License Division simply issues the paperwork by mail. The License Division does allow applicants to retrieve these documents in person, but special permission is required and absent intervention by counsel, appointments are not scheduled despite applicants' requests.

86.    Therefore, until applicants are issued the license *and* Purchase Authorization they cannot exercise their Second Amendment rights to keep and bear arms.

87.    For various reasons, many licensees want access to more than one handgun. Handguns at times jam or become otherwise inoperable, and having access to more than one handgun helps ensure that one would always be available for use—regardless if that is for use it in self-defense, or if one simply wants to practice shooting at a range. Additionally, for comfort, or to ensure a handgun is properly concealed, individuals often prefer to carry different handguns depending on what they are wearing or where they are going, and having more than one handgun is critical. Indeed, the Second Amendment refers to the right to keep and bear arm<u>s</u>, in the plural.

88.    If a handgun licensee wants to purchase an additional handgun, Title 10 § 10-302.1(a), of the New York City Administrative Code requires that they wait 90 days between purchases.

89.    Once the 90 days pass, the licensee must bring their license to an FFL, where they pay for and submit to another NICS check. If approved, the FFL completes a Purchase Authorization Request Form and lists the NICS check number on it.

90.    The remainder of the process is the same—the licensee must take photos of the firearm, and email those photos, photos of the safe, the handgun receipt, and the Purchase Authorization Request Form listing the NICS check number, to the Issuing and Purchase Authorization Unit.

91.    The Issuing and Purchase Authorization Unit then mails the updated license bearing the licensee's old and new firearms' serial numbers, along with a Purchase Authorization permitting the licensee to retrieve the new firearm, to the licensee's address on file, permitting the licensee to retrieve the firearm.

92.    The steps outlined in paragraphs 80-86, above, are repeated each time an applicant seeks to purchase a new handgun. The only difference is that rather than presenting a Notice of

Application Approval, the FFL will complete a Purchase Authorization Request form, and will note the NICS check number on that form.

## ROUTINE LICENSE DIVISION DELAYS

93.   The above describes the process which should happen, at least in theory. But that has proven not to be the case for hundreds, and possibly thousands, of applicants. Below are some highly routine and pervasive delays in the firearms license application process, which have proven to unnecessarily and unjustifiably delay issuing firearms licenses to those applicants whose applications were in fact approved:

**Delays in processing eCheck payments:**

94.   If an applicant pays via eCheck, the application is not deemed "Submitted" until after the License Division processes the payment on their end.

95.   While at times the License Division processes the payments within a matter of days—as the application page advises would be the case, other times they delay in doing so by two, three, or even five or seven, weeks from the date of payment. In many such cases, applicants email the License Division to advise that their banks had processed and issued the payments days or even weeks ago. Despite that, the License Division simply ignores the applicants' emails, and fails to process the payments on its end for an extended period of time.

96. For example:

   a.   J.W., App. No. CB2023XXXX07, submitted his application and paid the required fee on November 1, 2023. He called and emailed the License Division between November 3 and 17, but without success. Despite his bank processing his payment on November 1, 2023, his application only entered "Submitted" status on November 27, 2023. (He was approved one year later – on November 26, 2024, and he received his license on December 14, 2024).

b. C.L., App. No. SC2024XXXX73, submitted his application and paid the required fee on November 29, 2023. His application only entered "Submitted" status more than seven weeks later—on January 19, 2024. (Following additional delays addressed below, his application was approved after legal intervention).

c. R.L., App. No. CB2024XXXX65, submitted his application and paid the required fee on December 21, 2023. His application only entered "Submitted" status more than five weeks later—on January 27, 2024.

d. A.B., App. No.  CB2024XXXX55, submitted his application and paid the required fee on December 22, 2023. His application only entered "Submitted" status more than one month later—on January 26, 2024.

e. J.S., App. No. CB2024XXXX05, submitted his application and paid the required fee on February 7, 2024. Despite following up numerous times and advising that his payment was withdrawn from his account, his application only entered "Submitted" status on February 26, 2024. (Following additional delays addressed below, and after legal intervention, his application was approved on October 17, 2024).

f. J.C., App. No. CB2024XXXX38, submitted his application and paid the required fee on April 8, 2024. His application only entered "Submitted" status on April 25, 2024, after he emailed a screenshot of his bank statement proving that his payment was posted and processed on April 10, 2024. (As of February 26, 2025, his application is still in "Investigation.").

g. C.H., App. No. CB2024XXXX10, submitted his application and paid the required fee on December 17, 2023. His application only entered "Submitted" status more than one month later—on January 27, 2024. (He did not receive a decision as of February 27, 2025).

h. Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

97.    Until an application is marked "Submitted," it cannot progress through the remainder of the application process. Therefor by needlessly delaying in processing the application fee, the License Division causes the application to linger for no justifiable reason.

**Delays in scheduling fingerprinting appointments:**

98.   As noted above, State law requires applicants to submit fingerprints as part of the

firearms license application process. State law also requires the licensing officer to take and

submit applicants' fingerprints so the State can run a criminal background check and submit the

results thereof to the licensing officer.

99.   Scheduling a fingerprinting appointment is a purely administrative task, and it is often

done by an "FPT" – a Fingerprint Technician.

100.  In numerous instances, fingerprinting appointments are scheduled within a few days or

weeks after an application is submitted, and this should be the norm.

101.  However, the License Division *routinely* delays in scheduling fingerprinting

appointments by several *months*.

102.  For example:

   a.   M.M., App. No. PR2021XXXX04, submitted his application on June 1, 2021. He
        only received his fingerprinting appointment email almost *one year later*, on May
        17, 2022. (His investigator reached out approximately seven months later, on
        December 13, 2022, he was approved one week after that, and he received his
        license on January 13, 2024—19 months after he applied).

   b.   C.L., App. No. SC2024XXXX73, referenced above, submitted his application on
        November 29, 2023. He only received his fingerprinting appointment email
        almost five months later, on April 20, 2024 (His appointment was scheduled for
        May 3, 2024. His application was only approved several months later after legal
        intervention).

   c.   V.P., App. No. CB2024XXXX23, submitted his application on February 9, 2024.
        After several attempts at reaching the License Division, his son finally got
        through to someone on August 6, 2024—six months less three days after the
        application was submitted, and the fingerprinting appointment email was
        immediately issued. (The fingerprinting appointment was scheduled for
        September 27, 2024. He still did not receive a decision as of February 19, 2025).

   d.   E.N., App. No. SC2024XXXX46, submitted his application on February 12,
        2024. He only received his fingerprinting appointment email almost five months

later, on July 4, 2024 (His appointment was scheduled for July 15, 2024. After additional delays noted below, his application was approved on January 8, 2025).

e.  A.G., App. No. CB2024XXXX98, submitted his application on June 1, 2024. He only received his fingerprinting appointment email almost five months later, on November 19, 2024—after *he* called the License Division (and finally got through) to request an appointment. (His appointment was scheduled for December 6, 2024. He still did not receive a decision as of February 25, 2025).

f.  Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

103.  Until an applicant is fingerprinted, the application cannot and will not enter the "Investigation" phase. Consequentially, the application will not enter the queue to await the assignment of an investigator, and an investigator will therefore not be assigned.

104.  As noted, State law mandates an investigation before the licensing officer may issue a decision on the application. Therefore, by delaying in scheduling fingerprinting appointments, the License Division is prohibiting applicants from advancing through the application process. They are therefore building unnecessary delays into the process and into the time it takes to obtain a firearms license (if the applicant is approved).

105.  Additionally, by delaying in scheduling the fingerprinting appointment, the License Division delays in providing the "Handgun License Required Documents Checklist" to the applicant which advises the applicant as to what, if any, documents may be missing from the application. And given that this email is the first indication from the License Division regarding the requirement to submit an "Interview Questionnaire," by delaying in scheduling the fingerprinting appointment, the License Division is preventing applicants from submitting necessary documents, and without these documents, the application will not be processed or approved.

**Delays in taking fingerprints:**

106.  Regardless of whether an applicant receives a fingerprinting appointment email within a reasonable time after submitting the application, or whether the License Division unreasonably delayed in scheduling the appointment, many appointments are scheduled for three or more months after the application was submitted.

107.  For example:

    a.  A.B., App. No.  CB2024XXXX55, referenced above, submitted his application on December 22, 2023, but his fingerprinting appointment was only scheduled for May 31, 2024.

    b.  C.H., App. No. CB2024XXXX10, referenced above, received a fingerprinting appointment email on January 30, 2024, which scheduled the fingerprinting appointment for July 23, 2024—almost six months later.

    c.  M.F., App. No. CB2024XXXX82, received a fingerprinting appointment email on January 30, 2024, which scheduled the fingerprinting appointment for July 29, 2024—six months less one day later.

    d.  M.J., App. No. CB2024XXXX16, received a fingerprinting appointment email on February 8, 2024, which noted that the fingerprinting appointment was scheduled for August 20, 2024—more than six months later. (After legal intervention, his application was approved on December 20, 2024).

    e.  Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

108.  In addition to the above examples, hundreds more are listed in a document maintained by the License Division. On or about October 18, 2024, someone from the License Division inadvertently emailed an applicant an excel spreadsheet titled "Intake Spreadsheet 2023-2024."[14] This document listed 8,316 applications by application number, applicant's name, and application type. Critically, as to the 2023 applicants (through November 28, 2023 to be exact),

---

[14] This document—which is in Plaintiffs' possession, is not annexed to maintain the confidentiality of the applicants whose personal information were inadvertently shared by the License Division.

the spreadsheet listed the application dates (the date the application entered "Submitted" status and not the date the applications were necessarily submitted), and the fingerprinting dates. A review of those 3,432 entries revealed a clear pattern of applicants receiving fingerprinting dates that were more than three, four, or even five months after the applications were first submitted.

109. This extensive delay in being permitted to submit fingerprints, once again builds unreasonable and unnecessary delays into the application process and into the time it takes to obtain a firearms license, as it prohibits an applicant from advancing through the application process.

**Delays in moving applications to "Investigation" status following fingerprinting.**

110. Once an applicant is fingerprinted, the application status is changed from "Submitted" to "Investigation." At that point, the application enters the queue to await assignment to an investigator.

111. While the License Division typically updates the application status within hours of the applicant submitting fingerprints, at times they needlessly delay in doing so for days or weeks.

112. For example:

    a. J.H., App. No. PR2023XXXX57, submitted his application on March 17, 2023. He was fingerprinted on June 22, 2023, but his application status only entered "Investigation" on August 23, 2023. (After additional delays noted below, an attorney reached out on his behalf, at which point his application was approved on March 26, 2024).

    b. E.V., App. No. 2023XXXX99, submitted his application on September 22, 2023. He was fingerprinted on January 10, 2024, but his application status only entered "Investigation" on February 21, 2024—after he had emailed to inquire one day prior. (After additional delays noted below, he finally received his Notice of Application Approval on July 24, 2024).

    c. A.G., App. No. CB2024XXXX98, referenced above, submitted his application on June 1, 2024. He was fingerprinted on December 6, 2024, but his application

24

status only entered "Investigation" on January 24, 2025—after an attorney
reached out on his behalf.

d. Plaintiffs have numerous additional examples in their possession, which they can
easily supply in an amended complaint should this Court deem the above list
insufficient. Additionally, Plaintiffs intend on discovering countless additional
examples directly from the City during the course of discovery.

113.  As noted above, before an application enters "Investigation," it cannot enter the queue to

await the assignment of an investigator. Until an investigator is assigned, the application cannot

progress.

**Delays in applying fingerprints already on file to new applications:**

114.  As explained above, an applicant is only required to submit one set of fingerprints to the

License Division. Therefore, if an applicant is applying for a subsequent license, they are not

required to submit fingerprints a second time.

115.  Rather, the applicant should receive the "Fee Waiver Letter/Checklist" email containing

the "Handgun License Required Documents Checklist" and "Interview Questionnaire" attached

thereto.

116.  However, the License Division has neglected or failed to send the "Fee Waiver

Letter/Checklist" email on many occasions.

117.  For example:

a. N.K., App. No. CB2023XXXX25; PR2023XXXX26, submitted his applications
on August 31, 2023. He already had an active Rifle/Shotgun Permit, but he only
received his "Fee Waiver" email more than three months later, on December 2,
2023. His application statuses were then changed from "Submitted" to
"Investigation" on December 11, 2023. (After legal intervention, his applications
were approved on June 6, 2024).

b. N.L., App. No. CB2023XXXX38, submitted his application on November 20,
2023. He already had an active Premise Residence Handgun License, but he only
received his "Fee Waiver" email more than five months later, on April 26, 2024.
His application status was then only changed from "Submitted" to "Investigation"

almost one month later, on June 20, 2024. (He was only approved on September 16, 2024, following legal intervention).

c.  R.L., App. No. CB2024XXXX65, referenced above, submitted his application on December 21, 2023. He had previously applied for a Premise Residence Handgun License, and was fingerprinted on January 8, 2024 (three weeks prior to his Concealed application being marked "Submitted"), in connection with that application. Despite reaching out to inquire several times, he only received his "Fee Waiver" email almost eleven months later, on November 14, 2024, and his application status was changed from "Submitted" to "Investigation" the next day.

d.  J.S., App. No. CB2024XXXX05, referenced above, submitted his application on February 7, 2024. He already had an active Rifle/Shotgun Permit, but he never received the "Fee Waiver" email and his application remained in "Submitted" status for almost seven months. It only entered "Investigation" August 29, 2024—more than six months after the application was submitted, despite him following up several times.

e.  C.N., App. No. CB2024XXXX85, submitted his application on March 23, 2024. He already had an active Premise Residence Handgun License, but he never received the "Fee Waiver" email and his application remained in "Submitted" status for almost eight months. It only entered "Investigation" on December 6, 2024, after an attorney reached out on his behalf. (He was approved the following day, but the License Division only mailed his license on January 22, 2025).

f.  M.G., App. No. CB2024XXXX39, submitted his application on May 13, 2024. He already had an active Rifle/Shotgun Permit, but he did not receive the "Fee Waiver" email. Four-and-a-half months later, on September 27, 2024, his application status was changed to "Investigation" within minutes after an attorney reached out on his behalf. But he still did not receive his checklist. Accordingly, after an attorney followed up on his behalf once again, an investigator ultimately reached out to him on January 23, 2025. (His application was approved on January 27, 2025. He purchased his handgun and emailed the required documents and information to the Purchase Authorization Unit three days later. He finally received his license on February 14, 2025).

g.  J.B., App. No. CB2024XXXX18, submitted his application on June 24, 2024. He already had an active Premise Residence Handgun License, but he never received the "Fee Waiver" email and his application remained in "Submitted" status for approximately seven months. It went directly from "Submitted" to "Approved" on January 23, 2025, on day after an attorney reached out on his behalf.

h.  Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

118. By delaying or failing to send applicants the "Fee Waiver" email, the License Division unnecessarily delays applications in several ways.

119. Applications linger in "Submitted" status and never enter "Investigation," preventing an investigator from ever being assigned, which then prevents the application from advancing through the remainder of the process.

120. And by not sending the "Fee Waiver Letter/Checklist" email, the License Division neglects to advise the applicant to submit an "Interview Questionnaire," and does not advise the applicant as to what, if any, additional documents may be missing from the application.

**Delays in assigning an investigator:**

121. As explained above, New York State law requires that the License Division "investigate" the applicant prior to issuing a decision as to a firearms license application. Therefore, assigning an investigator to the application is mandatory. Without an investigator, a decision cannot and will not be issued.

122. However, the License Division routinely does not assign an investigator until *months* after an applicant is fingerprinted, even where an applicant is fingerprinted four or more months after submitting the application.

123. For example:

  a. I.R., App. No. SC2023XXXX79, submitted his application on March 11, 2023, and his application entered "Investigation" on June 15, 2023. On February 21, 2024—more than 11 months after he submitted his application, he was expressly told that an investigator was not yet assigned. (After an attorney reached out on his behalf, his application was approved on February 27, 2024, and he received his license on March 1, 2024).

  b. B.R., App. No. CB2023XXXX20, submitted his application on May 30, 2023, and his application entered "Investigation" on June 12, 2023. On February 14, 2024—eight-and-a-half months after he submitted his application, he was expressly told that an investigator was not yet assigned. (After an attorney

reached out on his behalf, his application was approved on February 20, 2024, and he finally received his license on or about May 6, 2024).

c. T.Y., App. No. CB2023XXXX89, submitted his application on July 21, 2023. He already had an active Premise Residence Handgun License and Rifle/Shotgun Permit, and was not required to submit fingerprints again. Accordingly, his application entered "Investigation" the day he applied. On April 8, 2024—almost nine months after he submitted his application, he was expressly advised that an investigator was not yet assigned, and that investigators are generally not assigned for a period of 6-9 months after entering "Investigation." (After an attorney reached out on his behalf, his application was approved on April 15, 2024, and he received his license on April 19, 2024).

d. M.A., App. No. CB2023XXXX53, submitted his application on October 19, 2023, and his application entered "Investigation" on February 12, 2024. On September 18, 2024—11 months after he submitted his application, he was expressly told that an investigator was not yet assigned. (After legal intervention, his application was approved on December 3, 2024).

e. C.P., App. No. CB2023XXXX18, submitted his application on December 22, 2023, and his application entered "Investigation" on March 28, 2024. On September 2, 2024—more than eight months after he submitted his application, he was expressly told that an investigator was not yet assigned. (After an attorney reached out on his behalf, his application was approved on November 21, 2024).

f. C.H., App. No. CB2024XXXX10, referenced above, submitted his application on December 17, 2023, and his application entered "Investigation" on July 23, 2024. After numerous calls to the License Division, he received an email on January 15, 2025 from an investigator advising she was assigned to his application, but that she "*will* be working on [his] application shortly." (He did not receive a decision as of February 27, 2025).

g. Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

124.  In fact, the License Division has affirmatively represented to *countless* applicants, in writing, that as a matter of License Division practice and procedure, investigators are not assigned until six-to-nine, or more, months *after* an applicant's fingerprinting appointment.

125.  For example:

a. J.H., App. No. PR2023XXXX57, referenced above, submitted his application on March 17, 2023, and his application entered "Investigation" on August 23, 2023. In response to his inquiries, in a March 5, 2024 email —approximately one year after he submitted his application, PO Mark Bernard represented as follows: "Your application is currently on queue awaiting to be assigned an investigator. . . . Please be advised that it may take several months or longer to be assigned an investigator even after fingerprinting. . . ." (After an attorney reached out on his behalf, his application was approved on March 26, 2024, and he received his license on or about July 17, 2024).

b. A.J., App. No. SC2023XXXX30, submitted his application on March 29, 2023, and his application entered "Investigation" on June 27, 2023. In response to his inquiries, in a February 21, 2024 email—almost eleven months after he submitted his application, PO Mark Bernard represented as follows: "Your application is currently on queue awaiting to be assigned an investigator. . . . Please be advised that it may take several months or longer to be assigned an investigator even after fingerprinting. . . ." (After an attorney reached out on his behalf, his application was approved on March 26, 2024, and he received his license more than one month later).

c. E.V., App. No. 2023XXXX99, referenced above, submitted his application on September 22, 2023. As noted above, his application entered "Investigation" on February 21, 2024, after he had emailed to inquire regarding his application lingering in "Submitted" status. In response to his inquiries, in a February 21, 2024 email, FPT Iesha S. Howard represented as follows: "*you will be assigned to an investigator 6-9 months from the date you were fingerprinted.*" (emphasis added). (He ultimately filed an Article 78 Petition, and, after some additional delays addressed below, his license was issued on August 29, 2024).

d. E.N., App. No. SC2024XXXX46, referenced above, submitted his application on February 12, 2024, and his application entered "Investigation" on July 16, 2024. In response to his inquiries, in a September 3, 2024 email, PO Yahaira Agate represented as follows: "YOU ARE PENDING AN INVESTIGATOR TO BE ASSIGNED IT CAN TAKE 6—9 MONTHS TO 13 MONTHS."

e. Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

126. In addition to emails, the License Division has made these identical representations to *countless* applicants over the phone.

127.  By delaying the assignment of an investigator until six to nine months, or longer, after an applicant's fingerprint appointment, the License Division, as a matter of policy and procedure, creates an extensive delay period during which the application merely lingers, unable to progress.

128.  Given this built-in delay, the License Division acknowledged that applications cannot be processed in a timely manner, and it affirmatively recognized that applications take, on average, well over a year to be processed.

129.  T.B., App. Nos. CB2024XXXX37; RS2024XXXX13, submitted his applications on June 26, 2024. He had contacted the License Division to inquire as to the status of his applications, and on October 3, 2024, he miraculously received a return call from Investigator April Cohen, who has been with the NYPD since 1992. She advised the following in a recorded telephone call: as to the "status of both applications, it *generally* takes . . . *twelve to eighteen months to process*." (emphasis added). When T.B. responded, asking "isn't that too long?," in light of the Penal Law's six-month mandate, Inv. Cohen responded "No, no, *we*, that's the *general* umm—, the *general* length. . . . I mean, it could be less time, but *we generally say twelve-to-eighteen months*. . ." (emphasis added).

**Delays in the 'investigation':**

130.  While State law mandates that an investigation be conducted, as explained above, the investigation is a fairly simple and straightforward process.

131.  In the initial click-through online application, and again in the fillable Interview Questionnaire, applicants check off "yes" or "no" in response to the statutory disqualifying criteria. And armed with applicants' fingerprints and social security information, the License Division obtains criminal and psychiatric documents and records. That's the "investigation."

132.  Unless an applicant failed to submit required documents, the 'investigation' is all completed well in advance of an investigator ever being assigned—but no one from the License Division takes the time to review the application until such time as the assigned investigator does so.

133.  The License Division *does not* reach out to applicants' references, employers, or neighbors, or anyone else for that matter. And at no time is the applicant actually 'interviewed.'[15]

134.  Upon information and belief, investigators merely follow a prepared checklist to determine whether an applicant should be approved or denied. This checklist, upon information and belief, lists all required documents as well as the statutorily disqualifying information.

135.  If all documents are submitted, none of the disqualifying characteristics are checked off by the applicant, and the criminal history and psychiatric results do not return disqualifying information, the applicant is automatically approved.

136.  Only if documents or information are missing does the investigator reach out to the applicant—generally via email, to request the missing information. No 'interview' is conducted, even then.

137.  To demonstrate how straightforward the 'investigation' process is, and how quickly it can be completed, after an attorney reaches out to the License Division regarding outstanding applications, investigators are often assigned, and decisions are then issued (which require supervisor review), within hours or days of the attorney's initial contact. Indeed, some applicants who had been lingering in "Submitted" status for months have gone straight from "Submitted" to "Approved" within a day or two of attorney contacting the License Division on their behalf.

---

[15] Despite the fingerprinting emails stating that the scheduled appointment is for both 'prints and interview,' the License Division *does not* "interview" the applicant. At the fingerprinting appointment, someone from the License Division—either a civilian or a Police Officer, briefly speaks with the applicant to advise as to whether any documents are missing from the application. That's all.

138.  And when investigators *do* reach out to applicants to request missing information, they generally provide applicants with a limited five-to-fourteen-day window to submit the missing information—otherwise the application is denied.

139.  For example:

    a.  J.D., App. No. CB2023XXXX89, submitted his application on August 18, 2023, and his application entered "Investigation" on September 21, 2023. An investigator finally reached out to him via email more than one year later—on October 14, 2024, requesting additional information. The investigator's email stated as follows: "In order to deliver a **timely decision** to your application, your **absolute cooperation** is imperative. . . . You will have **10 Business Days** to provide the remaining required documents. This is a very strict deadline and no extension will be given. / **DEADLINE DATE: MONDAY, OCTOBER 28TH, 2024 at 8:00 A.M."** (He was approved on November 19, 2024, and he received his license on December 28, 2024).

    b.  T.T., App. No. PR2024XXX81, submitted his application on November 13, 2023, and his application entered "Investigation" on January 4, 2024. After an attorney reached out on his behalf, an investigator reached out to him via email on December 9, 2024, requesting additional information. The investigator's email stated as follows: "In order to deliver a **timely decision** to your application, your **absolute cooperation** is imperative . . . You have **UNTIL DEADLINE OF 12/14/2024** to submit documents." (He was approved on December 12, 2024, and he received his license on February 20, 2025).

    c.  R.L., App. No. CB2024XXXX65, referenced above, submitted his application on December 21, 2023, and his application entered "Investigation" on November 15, 2024. After an attorney reached out on his behalf, an investigator reached out to him via email on January 9, 2025, requesting additional information. The investigator's email stated as follows: "All documents must be submitted by January 16, 2025. **No further extension will be given.**" (The application faced further delays which are noted below, and he was finally approved on February 20, 2025).

    d.  D.Y., App. No. CB2024XXXX76, submitted his application on April 15, 2024. After legal intervention, an investigator reached out to him via email on November 12, 2024, and requested additional information. The investigator's email stated as follows: "You will have *ten business days* from the date of this email to provide me with the above listed documentation. Failure to provide me with documentation by *Tuesday, November 26th, 2024* may result in your application being denied." (He ultimately filed an Article 78 Petition and was approved on December 6, 2024, and he received his license three days later).

e. G.F., App. No. CB2024XXXX30, submitted his application on June 29, 2024. He received an email from his assigned investigator on January 21, 2025, giving him "until Monday, January 27, 2025," to provide a few outstanding documents. The investigator's email stated that "this is a very strict deadline, and no extension will be given. Failure to provide the above listed documents by your deadline, may result in your application being denied."

f. Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

140.  Ironically, despite the investigators only reaching out to their respective applicants many months after their New York statutory timeframe to act upon the application already expired, they advise the applicants that these additional documents must be submitted *immediately* in order to receive a "timely" decision.

141.  Some individuals who were unable to comply with the strict less-than-two-week window due to work or family conflicts or other reasons, were in fact denied for the "failure to cooperate."

142.  Given that investigators often do not so much as look at applications until many months after submission, that itself causes additional delays with the 'investigation' process. By the time investigators review applications, the utility bills used to verify residency are often no longer deemed "current" by the License Division.[16] Therefore, rather than coming to a determination regarding an application immediately upon reviewing the application, investigators have *routinely* emailed applicants requesting an updated utility bill, which delayed decision as to numerous applications.

143.  Additionally, many times applicants are asked to resubmit documents they already provided. And at times applicants are asked to submit documents for a third time as well—once

---

[16] Plaintiffs have not established a clear pattern as when the License Division no longer deems a utility bill as "current."

when the application was submitted, again at their fingerprinting appointment, and a third time when the assigned investigator reviews the file.

144.  This is either used as a tactic to excuse or attempt to justify the *License Division's* delay in issuing a decision. Alternatively, it is possible that the License Division's document storage system is entirely disorganized and/or archaic and investigators and other License Division personnel cannot locate documents previously uploaded to the portal.

145.  The online portal does not allow applicants to view or verify the documents already uploaded and applicants do not receive any confirmation that documents were uploaded—only the License Division has access to that information.

146.  Therefore, the License Division often asks applicants to resubmit documents, claiming the applicant had failed to provide them. Despite those claims being false, the applicant generally has no means of proving that falsity to the License Division.

147.  Given that applicants cannot prove to their assigned investigator that they did in fact upload the 'missing' documents to the portal, applicants are forced to submit them again. And when doing so, many applicants have reported receiving an error message stating that the file names of the 'new' documents they are attempting to upload already exists in their online portal—because they had already uploaded them.

148.  And as with requesting an updated utility bill, rather than coming to a determination regarding an application immediately upon reviewing the application, investigators email applicants requesting additional documents which were in fact provided, and they often delay in reviewing applicants' response emails by weeks or months.

149. Additionally, if an assigned investigator is on leave for whatever reason, the License Division does not reassign the application—the application merely lingers until the assigned investigator returns:

150. For example:

    a. T.T., App. No. PR2024XXX81, referenced above, submitted his application on November 13, 2023, and his application entered "Investigation" on January 4, 2024. After many attempts at reaching the License Division, someone finally answered the phone on October 6, 2024. That individual advised that T.T. would not receive a decision for some time as the assigned investigator was out on sick leave, without an estimated return date. (After an attorney reached out his behalf, an investigator finally reached out to T.T. on December 9, 2024, and his application was approved three days later).

    b. Plaintiffs have additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

151. It goes without saying that if an investigator had unnecessarily delayed in reaching a decision, the applicant (if later approved) was unnecessarily delayed in receiving their license.

**Delays in supervisor approval:**

152. After an investigator reaches a determination, a supervisor reviews and signs off on the decision.

153. Upon information and belief, the supervisor merely looks at the prepared checklist to determine whether it indicates that all required documents and information were submitted and whether any of the disqualifying criteria apply. The supervisor then compares that with the investigator's determination.

154. If the checklist and determination match, then the supervisor enters the decision.

155. Upon information and belief, this process should not take longer than 30 minutes, at most—and even that is substantially more time than is reasonably required.

156.  However, in most instances, supervisors do not review applications until a minimum of four or more weeks have passed from the investigator's determination.

157.  For example:

    a.  M.W., App. No. CB2023XXXX38; RS2023XXXX37, submitted his applications on October 25, 2023. He was fingerprinted on January 29, 2024, and his applications entered "Investigation" on February 2, 2024. On June 28, 2024, he was advised that his application was with a supervisor for review (he was not told when it was submitted for review). (He was only approved on September 23, 2024, after legal intervention).

    b.  E.K., App. No. SC2023XXXX23, submitted his application on November 3, 2023, and his application entered "Investigation" on March 15, 2024. He reached out to his assigned investigator on May 30, 2024, and the investigator advised that the application was submitted (he did not indicate when) to a supervisor for review. E.K. also spoke with Insp. Hugh Bogle on that date, who advised that the assigned supervisor represented he would not get to E.K.'s application for another four weeks. (He was only approved months later—After an attorney reached out on his behalf).

    c.  R.L., App. No. CB2024XXXX65, referenced above, submitted his application on December 21, 2023, and his application entered "Investigation" on November 15, 2024. On January 10, 2025, his investigator emailed and confirmed that all documents were received, and that he was submitting the application to a supervisor for review. And on January 17, 2025, the investigator advised it was "in the supervisor's hands" (he did not indicate when it was submitted to a supervisor). (His application was finally approved on February 23, 2025).

    d.  J.O., App. No. SC2024XXXX03, submitted his application on April 12, 2024, and his application entered "Investigation" on July 5, 2024. On November 13, 2024, one week after an attorney reached out on his behalf, his investigator emailed to advise that all documents were received, and that he was submitting the application to a supervisor for review. He was only approved more than one month after that—on December 17, 2024.

    e.  Plaintiffs have numerous additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

158.  Until such time as a supervisor approves the investigator's decision, the applicant will not receive a determination. Without that determination the applicant cannot (if later approved) complete the process and obtain their license.

**Delays in receiving a Notice of Application Approval (handgun licenses only):**

159.  If a supervisor approves the application, the applicant's portal status is updated from "Investigation" to "Approved."

160.  Once that occurs, the License Division is required to issue a "Notice of Application Approval" to the applicant.

161.  38 RCNY § 5-07(a) mandated that "[i]f the application is approved the applicant shall receive a 'Notice of Application Approval' at *the email address* provided in the application." (emphasis added).

162.  Despite that, the License Division refused, as a matter of policy and practice, to email the Approval Notices, and they sent them via regular mail only.

163.  However, the License Division did not send them out immediately—they often delayed in mailing the Approval Notices by weeks or months.

164.  Additionally, the License Division routinely fails to mail the Approval Notices altogether, and numerous applicants have waited months without ever receiving them.

165.  For example:

    a.  E.V., App. No. 2023XXXX99, referenced above, was approved on June 24, 2024 after filing an Article 78 Petition, but the License Division would not email the Notice of Application Approval, and advised it would be mailed immediately. E.V. had still not received his Notice of Application Approval one month later, at which time the License Division finally consented to emailing it. That email, sent on July 24, 2024, had attached to it a Notice of Application Approval dated July 24, 2024—the License Division had never processed his Notice, or mailed it, prior to that date, despite updating the portal to "Approved" status one month prior.

b. C.N., App. No. CB2024XXXX85's portal status was changed from "Investigation" to "Approved" on December 7, 2024, but he never received the Notice of Application Approval via email or mail. Eventually, on January 22, 2025, an attorney reached out to the License Division on his behalf requesting that the Notice be emailed immediately, and the License Division then printed and mailed his license that same day. (The License Division was able to do so as C.N. was not looking to purchase a new handgun and he did not therefore require a Notice of Application Approval. He merely sought to carry the handgun already listed on his Premise license, and have that serial number added to his newly-approved Concealed license).

c. M.L., App. No. SC2024XXXX08, submitted his application on March 31, 2024. His portal status was changed from "Investigation" to "Approved" on December 13, 2024, but he never received the Notice of Application Approval via email or mail. Given that a Special Carry license merely authorizes a State, but non-City, resident to carry their out-of-City firearms within City limits, he repeatedly requested to have his Special Carry license printed with this out-of-City information (as is standard practice). However, the Purchase Authorization Unit would not do so without the Notice of Application Approval—which he never received. (An attorney eventually reached out on his behalf, and he received his license on January 31, 2025).

d. K.L., App. No. CB2023XXXX88; PR2024XXXX81, submitted his Concealed Carry application on November 12, 2023, and his Premise Residence application on February 20, 2024. Apparently, both applications were approved on March 28, 2024, however, the Notices of Application Approval were only emailed to him almost two months later—on May 16, 2024. (On May 17, 2024, he emailed all required documents and photos to the Purchase Authorization Unit to process both licenses. After an attorney reached out on his behalf, he received his licenses on June 27, 2024).

e. Plaintiffs have many additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

166. The License Division mails Notices of Application Approval via first-class mail, in regular No. 10 envelopes.

167. According to the United State Postal Service, it takes two days to send a letter from Manhattan, from where the License Division mails these Notices of Application Approval, to the boroughs, Long Island, and several additional New York counties, and it takes three days to mail

a letter from Manhattan to the remainder of the State. *See* Ex. D (Printed copy of "USPS Service Standards Maps," https://postalpro.usps.com/ppro-tools/service-standards-maps (printed Feb. 27, 2025)).

168.  However, the License Division Director repeatedly insisted, both in writing and via telephone, that the License Division prints and mails the Approval immediately, but that it takes the United States Postal Service 10 business days to mail a letter.

169.  Not only is that statement false—and it is presumably fair to say that everyone knows this is false, but postmark dates on countless envelopes containing the Approvals prove that the License Division delays, by days, weeks, or months, in mailing them.

170.  To attempt to avoid this unnecessary delay, in 2024 countless letters were sent to the License Division Director, Commanding Officer, and various lieutenants, insisting that the Notices of Application Approvals be sent via email as required by law. This request was also included in several Article 78 Petitions filed in New York State Supreme Court seeking to compel the License Division to issue decisions as to outstanding applications, and if those applications are approved, to issue the licenses applied for. In light of the License Division's refusal to comply with the Rules, the Petitions expressly sought to compel the License Division to email the Notices of Application Approval to the email addresses provided along with the applications.

171.  After some initial push-back, the License Division did, as a matter of course, begin emailing the Notices as required by law beginning in or about early Fall of 2024.

172.  In addition to applicants receiving their Notices on the day they were approved (for the most party), emailing the Notices also saved substantial resources. Rather than the License Division spending time and tax-payer dollars printing Notices, submitting them for a physical

signature, stuffing them into envelopes, stamping the envelopes, and sending them out to be mailed, they were now being electronically signed and emailed immediately.

173.  To circumvent this efficient, time-saving, and dollar-saving process, the City *amended* the rules on December 6, 2024 (effective January 5, 2025), to now allow for Notices of Application Approvals to mailed. The newly-amended rules provide as follows: "If the application is approved the applicant shall receive a 'Notice of Application Approval' by mail or at the email address provided in the application." *See* 38 RCNY § 5-07(a).

174.  While the License Division still emails some Notices, it is now once again creating unnecessary delays by building another two-to-three weeks, at a minimum, into the application process. These additional delays are entirely unnecessary—the License Division has, and at times still does, email the Notices as soon as the "Approval" status is entered into the portal. And given that New York City Rules allow for Notices to be sent via email, there is nothing to justify this additional and unnecessary delay.

175.  Without receiving the Notice of Application Approval, applicants cannot legally purchase a handgun, which means they cannot receive their firearms license which they were already approved to receive.

**Delays in receiving the License and Purchase Authorization (handgun licenses only):**

176.  As explained above, once an applicant, or licensee, purchases a handgun, they are required to submit certain documents and photos to the License Division's Issuing and Purchase Authorization Unit via email. The Issuing and Purchase Authorization Unit then reviews the documents to ensure all required information was provided, and that the handgun is New York City compliant.

177.   The Issuing and Purchase Authorization Unit is then supposed to print the license and prepare the Purchase Authorization, and mail them to the licensee's address on file—again via first-class mail in regular No. 10 envelopes.

178.   The review process only takes a few minutes. According to several individuals who have recently retrieved their licenses and Purchase Authorizations in person from the License Division, and witnessed their licenses being printed and Purchase Authorizations being completed on the spot, the entire process takes no more than five minutes..

179.   And yet, delays in this process—pertaining only to applicants who were in fact already *approved* for a handgun license, constitutes one of the greatest delays in the application process.

180.   There are several standard delays in this last stage in the application process before an approved applicant receives their license, or before a current licensee receives the updated license listing the additional handgun.

181.   As to newly-approved applicants, the License Division issues some applicants incorrect "Firearm Purchase Instructions."

182.   The instructions previously advise applicants to email only (1) the firearm receipt/bill of sale, (2) colored photos of the firearm, (3) safe receipt, and (4) photos of the safe. *See* Ex. C at 16.

183.   However, to process a firearm and issue a License and Purchase Authorization, the application must also email a copy of the Notice of Application Approval bearing the NICS Check No. But the old Firearm Purchase Instructions omit that—they advise applicants to bring that document with them to their in-person pickup appointment, but without legal intervention in highly-limited and unusual circumstances, appointments are *not* issued; licenses are merely mailed out via regular mail.

184.  Accordingly, if an applicant does not email that document—because they were not advised to, their submission is not processed.

185.  Upon receiving an incomplete submission, the Purchase Authorization Unit does not respond advising the applicant to submit the missing information—the submission is simply ignored.

186.  At the start of 2025, the License Division did update their Firearm Purchase Instructions, and they issued "New License Issued Instructions" which *does* advise applicants to email their Notice of Application Approval bearing the NICS Check No. *See id.* at 17. Despite that change, as of February 2025, the License Division *continues* to attach copies of the old and inaccurate instructions to many applicants.

187.  The Purchase Authorization Unit also supposedly ran out of supplies. For the entire month of October 2024, applicants were told that licenses could not be printed because the License Division ran out of plastic cards on which to print them, and other supplies.

188.  The NYPD's 2024 budget was close to $6 billion. There is no excuse for the apparent failure to order plastic cards and other supplies.

189.  Before this supposed shortage of supplies, and even after supplies were replenished, the Purchase Authorization Unit simply did not, and does not, routinely print licenses. They have three printers specifically designated to print licenses, and yet those printers sit idly, without being used.

190.  Countless applicants waited to receive their license for more than two or three, or more, months, and many have been told that due to the vast number of applications being processed, there is a backlog in the printing process.

191.  But applicants who have picked up their licenses in person at different times on several different dates, and watched their licenses being printed, attested to the fact that the printers were off, and no one was printing any licenses prior to theirs being printed.

192.  At times, some (but not all) of the printers were not working. But on other occasions all three printers were functioning but were simply not being used.

193.  For example, one individual met with the Director in November 2024 to retrieve licenses. He accompanied the Director to the printing station, where all three printers sat idle without being used. He heard the Director ask one of the officers which of the printers were functioning, and he heard the Director being told that all three were functioning. In his presence, the Director then printed the licenses from one of the printers.

194.  Occasionally, an applicant receives an acknowledgment to their handgun submission email, advising the applicant to "please contact us via email" if they did not receive their license "within 30 *business* days." (emphasis added). That timeframe amounts to a minimum of 6 weeks—but longer if holidays fall out within that timeframe.

195.  It does not, and should not, take 6+ weeks to print and mail a license, yet applicants wait, for months on end, to receive their licenses in the mail.

196.  And despite acknowledging the handgun submission email and advising the applicant that the license should be received within 30 business days, that has often proven not to be the case.

197.  But when applicants reach out via email, as they were directed to do, those emails go unanswered.

198.  The two individuals at the Purchase Authorization Unit who appear to process and issue licenses, are Investigator Sandra Smith and Senior Police Administrative Aid Kai Gibson. When

an applicant receives a response from the Purchase Authorization Unit, it is often sent from either of them.

199.  Inv. Smith's inbox, however, is often full. And when individuals attempt to reach out to her, they often receive error messages stating that the email did not go through.

200.  Accordingly, while this last stage in the process is simple – the documents are reviewed and processed and the license and Purchase Authorization are printed and mailed, it often takes months for the License Division to mail them.

201.  For example, as to newly-approved applicants waiting to receive their first New York City handgun licenses:

    a.  N.K., App. No. CB2023XXXX25; PR2023XXXX26, referenced above, submitted his applications on August 31, 2023, and was approved on June 6, 2024. On June 19, 2024, he emailed all required documents and photos to the Purchase Authorization Unit. Despite reaching out to inquire several times, he never received a confirmation email acknowledging his submission. After an attorney reached out on his behalf, he finally received his license and Purchase Authorization in or about the first week of August 2024.

    b.  J.H., App. No. CB2024XXXX29, submitted his application on December 13, 2023, and was approved on May 28, 2024. On September 12, 2024, he emailed all required documents and photos to the Purchase Authorization Unit. Despite reaching out to inquire several times, he never received a confirmation email acknowledging his submission. After an attorney reached out on his behalf, he finally received his license and Purchase Authorization in mid-December 2024.

    c.  M.C., App. No. PR2023XXXX64, submitted his application on December 27, 2023, and was approved on November 13, 2024. On November 16, 2024, he emailed all documents and photos indicated in the Firearm Purchase Instructions sent to him, to the Purchase Authorization Unit. The old instructions he received did not advise him to email the Notice of Application Approval bearing the NICS check number, and his requests to confirm that all required documents were received, were ignored. After legal intervention, he finally received his license and Purchase Authorization on February 6, 2025.

    d.  G.S., App. No. CB2024XXXX32, submitted his application on May 5, 2024, and he was approved on October 22, 2024. On October 28, 2024, he emailed all

required documents and photos to the Purchase Authorization Unit, and he received a confirmation via email on November 3, 2024 that the documents were received. His license was listed as "Active" in the portal by mid-to-late November 2024, but despite numerous follow-up inquiries, he only received his license on February 20, 2025.

e.  J.O., App. No. SC2024XXXX03, referenced above, submitted his application on April 12, 2024, and was approved on December 17, 2024. No Notice of Application Approval is required given that his application is one for a Special Carry. Despite reaching out to inquire several times, his license only went "Active" sometime between February 14-17, 2025, and he finally received it on February 26, 2025.

f.  T.T., App. No. PR2024XXX81, referenced above, submitted his application on April 12, 2024, and was approved on December 12, 2024. He submitted all required documents and photos to the Purchase Authorization Unit on December 16, 2024. His license finally went "Active" on February 17, 2025, and he received it on February 20, 2025.

g.  Plaintiffs have many additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

202.  As to licensees who are waiting to receive their updated licenses listing additional handguns:

a.  A.C., App. No. CB2022XXXX11, submitted his application on August 25, 2022, and was approved on October 9, 2023. After receiving his initial license, he purchased an additional handgun to add to that existing license, and then emailed all required documents and photos to the Purchase Authorization Unit on April 12, 2024. Despite reaching out to inquire several times, he never received a confirmation email acknowledging his submission. After an attorney reached out on his behalf, he finally received his updated license and Purchase Authorization on June 11, 2024.

b.  N.R., App. No. CB2023XXXX15, submitted his application on September 25, 2023, and was approved on January 17, 2024. After receiving his initial license, he purchased an additional handgun to add to that existing license, and then emailed all required documents and photos to the Purchase Authorization Unit on May 9, 2024. Despite reaching out to inquire several times, he never received a confirmation email acknowledging his submission. After an attorney reached out on his behalf, he finally received his updated license and Purchase Authorization on June 10, 2024.

c.  J.F., App. No. PR2023XXXX12, submitted his application on November 3, 2022, and was approved on November 27, 2023. After receiving his initial license, he purchased an additional handgun to add to that existing license, and then emailed all required documents and photos to the Purchase Authorization Unit on May 24, 2024. Despite reaching out to inquire several times, he never received a confirmation email acknowledging his submission, and as of July 29, 2024, he still did not receive his updated license or any related communications.

d.  N.K., App. No. CB2023XXXX25; PR2023XXXX26, referenced above, submitted his applications on August 31, 2023, and was approved on June 6, 2024. After receiving his initial license, he purchased an additional firearm to add to that existing license, and then emailed all required documents and photos to the Purchase Authorization Unit on October 7, 2024. On October 15, 2024, he received an email confirming that all required documents were received. He then received his 'new' license two months later—on November 12, 2024, but his new firearm was not listed on it. He reached out to inquire several times, and was advised that his corrected license and Purchase Authorization would be issued, but by February 20, 2025 he had still not received them.

e.  S.T., App. No. CB2023XXXX57, submitted his application on November 6, 2023, and was approved on May 16, 2024. After receiving his initial license, he wanted to add handguns which he owns in another state to his City license. He emailed a detailed explanation, as well as all required documents and photos, to the Purchase Authorization Unit on August 16, 2024. On August 26, 2024, he received an email confirming that all required documents were received and that his license would be printed. After reaching out to inquire several times, he finally received his license on November 6, 2024.

f.  R.S., App. Nos. PR2020XXXX93; LC2022XXXX26,[17] submitted his applications in 2020 and 2022, respectively, and the Premise license has since been renewed. R.S. wanted to purchase one more handgun per license. He purchased a new handgun for his Premise license, and then emailed all required documents and photos to the Purchase Authorization Unit on August 6, 2024. And he purchased a new handgun for his Concealed license, and then emailed all required documents and photos to the Purchase Authorization Unit on September 10, 2024. Despite emailing the License Division to inquire several times over the course of three months, he never received an acknowledgement to either submission. After an attorney reached out on his behalf, the License Division advised that the licenses were mailed on November 21, 2024. But the envelope in which they arrived was postmarked November 26, 2024, and R.S. received the licenses on November 29, 2024.

g.  Plaintiffs have many additional examples in their possession, which they can easily supply in an amended complaint should this Court deem the above list

---

[17] "LC" means "Limited Carry." At the time R.S. applied for a Carry permit, the Concealed category was not yet available. But when he approved, his license type was converted to a Concealed Carry.

insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

203.  In addition to approved applicants being excessively and unreasonably delayed in exercising their rights to keep and bear arms, delays in printing and mailing licenses and Purchase Authorizations create several additional issues.

204.  NICS checks are only valid for 30 days, and a licensee must have a valid NICS check at the time they retrieve their firearms. Therefore, if licensees do not have their licenses and Purchase Authorizations in hand within those 30 days—which precludes them from retrieving their handguns within that window, they must pay for and submit to another NICS check in order to take possession of the firearm.

205.  Many FFL's charge a monthly storage fee if the handgun was not retrieved within 30 days, and countless applicants have been forced to pay those fees simply because the License Division did not issue their license and Purchase Authorization in a timely manner.

206.  Additionally, while the New York City Administrative Code contemplates licensees purchasing new firearms every 90 days—allowing for up to four purchases in a year, the License Division's excessive delays in mailing the license and Purchase Authorization prevent licensees from making those additional purchases.

**Delays in receiving the Rifle/Shotgun Permits:**

207.  As noted, the City is the only locality within the State of New York which requires a license to have a rifle or shotgun. In the rest of the State, individuals can simply walk into a store, submit to a NICS check, and walk out the door with a rifle or shotgun that same day.

208.  Perhaps recognizing that it is the odd man out, the City intended that the Rifle/Shotgun Permit application process be quick and efficient.

209.  Title 10 § 10-303(e)(1) of the New York City Administrative Code provides as follows:

> Upon completion of the investigation, and *in no event later than thirty days from the submission of the application*, unless the police commissioner determines more time is needed for an investigation and then *it shall not exceed sixty days*, the commissioner shall issue the permit or shall notify the applicant of the denial of the application and the reason or reasons therefor.

(emphasis added).

210.  However, the License Division does not comply with that Rule.

211.  As a general practice, applications for Rifle/Shotgun Permits are processed the same way,[18] and in the general time period, as handgun license applications.

212.  Indeed, as to *dozens* of applicants known to Plaintiffs who submitted both handgun and Rifle/Shotgun applications, the applications are decided at the same time, and the Rifle/Shotgun application suffers the same unreasonably and excessive delays addressed in detail above.

213.  Despite the *City's* statutory mandate to issue Rifle/Shotgun Permits to approved applicants within 30 days from the date the application was submitted, or at the very least, within 60 days, of the countless *approved* applications for Rifle/Shotgun Permits which are known to Plaintiffs, just two of those permits were issued within three-and-a-half months, and another permit was issued within approximately four months. The rest were not issued until five, six, or even 12 or more months after the applications were first submitted.

214.  Plaintiffs have many examples in their possession, which they can easily supply in an amended complaint should this Court deem these allegations insufficient. Additionally, Plaintiffs intend on discovering countless additional examples directly from the City during the course of discovery.

---

[18] Certain application documents, such as character reference letters and Interview Questionnaires, are not required when applying for a Rifle/Shotgun Permit.

**License Division's lack of response to phone calls and emails:**

215.  In addition to the unresponsiveness of the Purchase Authorization Unit noted above, the rest of the License Division is, more often than not, unresponsive to applicants as well.

216.  The License Division's website contains "Contact Us" page, listing the telephone numbers for the Handgun and Rifle/Shotgun Sections, generally, as well as email addresses for the various units in those sections. *See* NYPD License Division, *Contact Us* https://licensing.nypdonline.org/contact-us/ (last visited, Feb. 21, 2025).

217.  Additionally, the Rules mandate that applicants "must maintain and provide to the License Division a functional email address to serve as the applicant's primary means of communication with the License Division." *See* 38 RCNY § 5-05(11)

218.  However, when applicants email various units and sections within the License Division—for application-specific questions, status updates, or to submit additional documents or information, their emails are, for the most part, ignored.

219.  Telephone calls are also generally ignored. Hundreds of applicants have reported trying to call numerous extensions at the License Division, however the calls keep ringing endlessly and no one answers the phone. And although applicants often leave voicemails, they generally, and with limited exceptions, do not receive a return call.

220.  Individuals who have been to the License Division have described a vast room where approximately 50 personnel—regardless of title or rank, were seated. They've described these personnel talking and laughing amongst themselves, with very few of them engaging their computers or appearing to be doing much work. The only individual who seemed to be working was the License Division Director herself and perhaps her immediate staff.

221.  And disturbingly, despite hundreds of accounts of applicants calling the License Division, those who have been there in person described the sheer lack of ringing phones that they were greeted with—apparently phone lines are either muted or disconnected at the License Division and those who work there simply ignore most incoming calls.

222.  Hundreds of applicants have emailed the License Division in the past months and years to complain that their prior attempts at reaching out—via email or telephone, were ignored. Those emails are also ignored.

### LICENSE DIVISION'S PENAL LAW § 400.00(4-b) VIOLATIONS

223.  State law recognized that the application process is not, and should not, be lengthy or drawn out. As noted above, Penal Law § 400.00(4-b) mandates that the "licensing officer ***shall*** act upon any application for a license pursuant to this section ***within six months of the date of presentment of such an application***," and that in "acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application ***and issue the license applied for***." (emphasis added).

224.  Accordingly, State law recognizes that for an approved applicant to receive a license within the six-month window, a decision must have been made well in advance of that six-month window.

225.  The City itself recognized that the six-month period from application submission through license issuing also accounts for a 30-day turnaround period from when applicants receive the Approval Notices until they purchase their handguns and submit the documents and photos to the Purchase Authorization Unit for processing. Indeed 38 RCNY § 5-07(c) gives applicants at least 30 days to complete these steps.

226. As outlined above, the Penal Law contemplated a quick 'investigation,' made "without unnecessary delay." *See supra* ¶ 31. And the New York Legislature expressly contemplated that firearms license applications will be processed promptly.

227. The *only* exception to <u>issuing</u> an approved license within six months of the application being submitted is where the License Division advises the applicant, in writing, that the *applicant* created a delay sufficient to constitute "good cause." *See* PL § 400.00(4-b).[19]

228. According to State law, "***Any*** violation by any person of any provision of this section is a class A misdemeanor." *See id.* § 400.00(15) (emphasis added).[20]

229. Despite the clear statutory mandate, and in addition to the highly regular and routine delays outlined above, the License Division, as a matter of policy and practice, knowingly, and routinely, violates PL § 400.00(4-b). It does so by doing the following:

    a.  Routinely scheduling fingerprinting appointments too close to the six-month statutory deadline to allow for sufficient time to complete the remainder of the process, or beyond the six-month period making it inherently impossible to comply with State law.

    b.  Creating and executing an internal policy and practice of only assigning investigators six or more months after the fingerprinting appointment, making it inherently impossible to comply with State law.

    c.  Creating and executing an internal policy and practice of deciding applications 12-18 months after the applications were first presented to the License Division, again making it inherently impossible to comply with State law.

---

[19] The License Division has not done so as to any of the applications referenced in this Complaint.
[20] Unfortunately, New York State did not create a private right of action as to violations of the Penal Law. If the State had done so, Plaintiffs would have submitted those claims as well.

    d.   Indicating via email that licenses would be issued within "30 business day" of the applicant *receiving a confirmation* that the Issuing and Purchasing Authorization Unit received the applicant's documents and photos.

    e.   Failing to timely issue licenses to approved applicants whose applications were already beyond the six-month statutory deadline.

    f.   Knowing that the application process is highly delayed, yet creating unjustified delays at *every* stage of the process as outlined above.

230.  The License Division also affirmatively demonstrated that it had, and has, no intention of complying with State law. The New Application Instructions which are listed on its website, provides as follows: "Within approximately six months of receipt of your handgun application, and all required documents/forms, you will receive a letter informing you whether *your application was approved*." *See* Ex. A at 3 ¶ 12 (emphasis added). But licenses are required to be *issued* within this timeframe.

231.  And in response to attorneys' inquiries on behalf of applicants who still did not receive decisions on their applications two-to-three weeks before the expiration of the six-month deadline, the License Division Director responded, stating that the applications were only submitted less than six months prior. But to comply with the Penal Law and issue the license applied for within six months of the application being submitted, the License Division is required to issue decisions well in advance of that time.

232.  Despite the State mandate to issue the *license* which the applicant applied for, and was approved for, within six months of the application date, the License Division affirmatively indicated that it has no intention of complying with that mandate. And despite knowing that it

created a 2-3+ month delay from issuing a decision until the license is issued, the License

Division publicized that it only intends on issuing *decisions* within six months.[21]

## LICENSE DIVISION'S DELIBERATE INDIFFERENCE TO THE VIOLATION OF APPLICANTS' SECOND AMENDMENT RIGHTS

233.  The Second Amendment to the United States Constitution guarantees the rights of
ordinary citizens to keep and bear arms.

234.  Like other rights guaranteed by the Bill of Rights, the Second Amendment is not a second
class right, which one is entitled to exercise only at the whim and discretion of government
personnel.

235.  Despite the License Division's duty to 'investigate,' background investigations are
supposed to be quick and efficient, and licensing officers' 'investigations' are not supposed to
result in unnecessary delays and backlogs in processing applications, particularly where the
relevant information is supplied by the applicant.

236.  Lengthy wait times in processing firearms license applications, and in issuing firearms
licenses to those applicants who were in fact approved, violates the ordinary citizen's right to
keep and bear arms, as they are legally prohibiting from exercising those rights until such time as
their licenses are in hand.

237.  Lengthy wait times in processing firearms license applications, and in issuing firearms
licenses to those applicants who were in fact approved, effectively denies ordinary citizens the
right to keep and bear arms for the period of time in which their applications were being
processed.

---

[21] As demonstrated above, it routinely, and as a matter of course, fails in this respect as well.

238.  Despite that, the License Division maintained a policy and custom of unjustifiably and unreasonably delaying firearms license applications, and they put the process toward abusive ends.

239.  The License Division maintained a policy and custom of delaying processing and deciding firearms license applications, and, as to approved applicants, delaying issuing the Notices of Application Approval, and ultimately, the firearms licenses and Purchase Authorizations.

240.  Given the written representations from License Division personnel outlined above as to the *License Division's* anticipated timeframe to assign investigators, process and decide applications, and issue licenses and purchase authorizations, it is reasonable to infer that the License Division's policy of delaying firearms license applications and delaying issuing licenses and Purchase Authorizations, was formalized—whether in writing or otherwise.

241.  Even if the policy was not formalized, in light of the above, the License Division's practices were so highly persistent and widespread that the delays by License Division personnel—both civilian and uniformed, are so permanent and well settled and effectively constitute a regular custom and usage.

242.  Given the above, the License Division's policy and practice of delaying firearms license applications and delaying issuing licenses and Purchase Authorizations, practically speaking, has the force of law.

243.  The fact that the License Division's *website* indicates that decisions as to handgun license applications would be issued within six months does not work to undermine the City's unconstitutional policy and practice.

244.  Similarly, the fact that the City's Rules mandate that Rifle/Shotgun Permits be issued within 30 days also does not work to undermine the City unconstitutional policy and practice.

245.  Even if, hypothetical speaking, that six-month timeframe—to issue a handgun license application decision (as opposed to issuing the actual license permitting one to possess and carry a firearm and exercise Second Amendment rights) is constitutional, New York City, through its Police Department and License Division, nonetheless routinely and persistently failed to do so. Additionally, an approval alone—without the License and Purchase Authorization, does not allow one to exercise their Second Amendment rights.

246.  Additionally, despite knowing of close to one hundred Rifle/Shotgun Permit applications, Plaintiffs are not aware of a single application which was *decided* within 30 (or 60) days. And of course deciding an application is still steps away from issuing the Rifle/Shotgun Permit. Indeed Plaintiff Zou is the only individual known to Plaintiffs who received a decision as early as three months.[22]

247.  Not only did the License Division maintain an unconstitutional policy and practice of delaying firearms license applications and delaying issuing firearms licenses and Purchase Authorizations, but the policy-making officials of the City and its License Division were on notice of these pervasive violations, yet they made no effort to prevent them from continuing to occur.

248.  The City, the License Division, and their policy-making officials, know that without a License and Purchase Authorization an individual cannot exercise their Second Amendment rights to keep and bear arms. Indeed, they made those laws. Despite that, they failed to take action or implement measures to ensure these delays ceased.

---

[22] It appears Zou's Rifle/Shotgun application was decided that early because it was submitted months after he had submitted a Concealed Carry application. His applications are addressed further below.

249. Accordingly, the City and its License Division's policy-making officials acted with deliberate indifference to the violations of applicants' Second Amendment rights.

250. Many examples of the pervasive delays, and the License Division's representations to applicants of *its* timeline for processing applications, were already discussed above.

251. But the City and its License Division's policy-making officials were also expressly put on notice that their actions violated applicants' Second Amendment rights by attorneys and other individuals who reached out to them regarding their delays.

252. For example, from 2023 through the present, attorneys have reached out to the License Division regarding its excessive delays in processing and deciding hundreds of applications, and its excessive delays in issuing licenses (and Purchase Authorizations) to those applicants who were in fact approved.

253. In the year 2024 alone, just one law firm wrote letters to the License Division, sent via email—copying its Director, Commanding Officer, and various lieutenants (in addition to certain investigators as relevant), on behalf of approximately 200 applicants. These letters asked the License Division to issue decisions as to applicants' outstanding firearms license applications, and to issue licenses (and Purchase Authorizations) to applicants who were either awaiting their first City handgun licenses, or updated licenses listing additional handguns.

254. In addition to the letters, in the year 2024 alone, that law firm also filed Article 78 Petitions on behalf of 20 applicants, naming New York City, its Police Department, Commanding Officer, and various Lieutenants as respondents. These Petitions sought to compel the respondents to issue decisions as to the petitioners' outstanding firearms license applications, and if those applications were approved, it sought to compel the respondents to issue the licenses applied for.

255.  Every single one of those letters and Petitions provided a timeline of the individual applicants' application, annexed the email communications between the applicant and the License Division, summarized any oral communications between the applicant and the License Division, and outlined the specific delays which the individual applicant faced.

256.  Critically, every single one of those letters, and every single Petition, quoted, in full, PL §§ 400.00(4-b) and (15), and advised the License Division that it was beyond the statutory timeframe to act on the particular application—they even listed the number of days by which the License Division was beyond the six-month window. And if members of the License Division had represented to the particular applicant, either via email or orally, that the License Division, as a matter of course, did not investigate or decide applications for several months after the application was submitted or the applicant was fingerprinted, that information was also included in the letters to the License Division and in the Petitions against the City.

257.  Letters written on behalf of applicants who were already approved, but did not receive the license they applied for (and the accompanying Purchase Authorization), also expressly advised that the License Division, and its Director, Commanding Officer, and various employees, were violating the particular applicant's Second Amendment rights by unreasonably and unjustifiably delaying the applicant's ability to keep and bear arms.

258.  Every one of those letters were delivered, and not a single letter bounced back as undeliverable, and every Petition was formally served on the City of New York (which appeared in every single one of these Petitions)[23] and then emailed to the License Division Director, Commanding Officer, and various lieutenants (and they did not bounce back either).

---

[23] The City therefore has these Petitions in its possession. To protect the anonymity of the various Petitioners as practically as possible, Plaintiffs are incorporating every one of these Petitions by reference but without identifying their index numbers.

259.  As to the letters, the License Division Director (and sometimes the Commanding Officer), personally, and the License Division Desk generally, affirmatively acknowledged, and often responded to, these letters.

260.  And after receiving these letters, which affirmatively notified the License Division, and its Director, Commanding Officer, and various lieutenants, that they were in violation of PL § 400.00(4-b) as to the *particular* applicant, the License Division, in most instances, *promptly* issued decisions as to those applicants' applications—presumably recognizing their violations. But the License Division then *continued* to violate the Penal Law as to those applicants whom they did approve, by delaying in issuing the licenses and Purchase Authorizations.

261.  As to the applicants who filed Article 78 Petitions, the City, with the assistance of the License Division Director, *promptly* resolved every application—which included issuing the licenses applied for to those applicants who were approved,[24] before judicial decisions could be issued.

262.  Despite recognizing its violations, the City, and its License Division, continued, and still continues, to violate its statutory obligations as to hundreds, and perhaps thousands, of other applicants who did not engage an attorney to reach out to them on their behalf.

263.  Given that the License Division's violations continued despite being placed on notice of the continued violations, in 2025 as of the date of this filing, letters, which included the same information referenced in paragraphs 253 and 255-57 above, were emailed to the License

---

[24] CPLR 7803 limits filing Article 78 petitions to four questions only, and the petitioners filed their Article 78 Petitions pursuant to CPLR 7803(1): "whether the body or officer *failed* to perform a *duty* enjoined upon it *by law*." (emphasis added). Without PL § 400.00(4-b)'s mandate that the licensing officer act upon a firearms license application within six months of presentment, there would not have been a legal basis upon which to file the Article 78 Petitions, in which case the City would not have worked to resolve those matters.

Division—again copying its Director, Commanding Officer, and various lieutenants (in addition to certain investigators as relevant), on behalf of approximately 50 applicants.

264.  Numerous other applicants, and other attorneys, have also written to the License Division's command, and have filed Article 78 Petitions against the City, given the License Division's excessive delays in acting upon firearms applications, in gross violation of the Penal Law.

265.  While Plaintiffs recognize that violating PL § 400.00(4-b) does not, in and of itself, constitute a constitutional violation, these letters and Article 78 Petitions notified the City and its License Division's command of the unreasonable and excessive delays in deciding firearm license applications and issuing licenses (and Purchase Authorizations) to those applicants who were approved.

266.  Additionally, the License Division's knowing and persistent violation of PL § 400.00(4-b), which, as noted above, is a Class A misdemeanor, demonstrates a clear disregard of their statutory mandates, and a complete disregard of the rights of applicants whose applications they are processing and deciding.

267.  Additionally, other lawsuits were filed which also placed the City, and its License Division, on notice of these continued unreasonable and unjustifiable application-processing delays.

268.  For example, *Meissner v. City of New York*, 1:23-cv-1907, was filed almost two years ago, on March 6, 2023. It affirmatively challenged the License Division's excessive delays, and alleged various claims related thereto, and Plaintiffs are incorporating that Complaint by reference. Significantly, the *Meissner* complaint was filed not only against the City, but it also named as defendants the NYPD, its Police Commissioner, its License Division, and its License

Division Director, Nicole Berkovich—the same individual still serving as Director today. *See Meissner v. City of New York*, 23-cv-1907, DE 1 (Compl.). That Summons and Complaint was served on March 20, 2023. *See* DE 18. The City, and its administrative arm—the NYPD and its License Division, entered their appearance on March 27, 2024, *see* DE 19, and a Waiver of Service and Notice of Appearance was then entered on behalf of the License Division Director on April 11, 2023. *See* DE 20-21.[25]

269.  These letters, Petitions, and lawsuits placed the policy-making officials within the License Division specifically, and within the City and its Police Department generally, on notice that License Division personnel *routinely* and *consistently* engaged in excessive and unjustifiable delays in processing firearms license applications and in issuing the licenses (and Purchase Authorizations) applied for.

270.  The City's amendment of 38 RCNY § 5-07(a) further proves that it had notice of these letters and Petitions. As noted above, the License Division Director refused to have the License Division email Notices of Application Approvals—as the Rules then required. But in response to the letters and Article 78 Petitions seeking, in part, to compel the License Division to email the Approval Notices as required by law, the *City*, as an entity, changed *its* Rules to now allow the Approval Notices to be mailed.

271.  Given their notice as to these excessive and unjustifiable delays, policy-making officials within the License Division specifically, and within the City and its Police Department generally, were on notice that the Second Amendment rights of applicants for firearms licenses were routinely and consistently violated.

---

[25] The defendants filed a motion to dismiss on August 12, 2024—but only as to count five, which did not address the delays challenged here. *See* DE 47.

272.  Despite that, other than amending its Rules to now once again permit the unnecessary delay of submitting Approval Notices via mail, the City failed to take measures to ensure that as a matter of policy and practice, firearms license applications were processed in a timely, and at the very least Penal-Law-compliant, manner.

273.  Rather, the policy-making officials within the License Division specifically, and within the City and its Police Department generally, simply allowed these violations to continue, knowing they were doing so at the expense of applicants' Second Amendment rights—they did not amend their internal policies and practices, and they did not sanction the violations. It appears they took no action, whatsoever.

274.  Simply stated, City policy-making officials were deliberately indifferent to the violation of applicants' Second Amendment rights.

## PLAINTIFFS' APPLICATIONS

### ROBERT P. MILANI

275.  Milani is a resident of Suffolk County, New York.

276.  Prior to submitting his City application, he possessed (and still possesses) an active State of New York County of Suffolk Carry Pistol License. Accordingly, he was already vetted by the designated licensing officer in Suffolk County, and was found to qualify for a carry license under State law.

277.  Milani is a truck driver, and he always carries a firearm for self-defense when he drives for work. He routinely enters the City in the course of his employment. However, without a City license, he was forced to stop to unload his handgun and secure it, and the ammunition, in separate locked containers, prior to entering the City. Despite possessing a valid Suffolk Carry Pistol License, he was legally prohibited from carrying a handgun in the City for self-defense.

278.  On August 2, 2023, Milani submitted an application for a Concealed Carry[26] Handgun License with the NYPD via its online portal. At that time, he also paid the required $340 application fee via eCheck. *See* Ex. E at 1-2 (Milani application documents).

279.  The License Division delayed his application at the outset. They only processed his payment, marked his application "Submitted," and issued his application number three weeks later—on August 23, 2023. *See id.* at 3.

280.  Almost three weeks later, on September 12, 2023, Milani received an email advising that his fingerprinting appointment was scheduled for October 2, 2023. *See id.* at 4. That email also advised that his application was missing necessary documents which he was required to submit prior to appearing for his scheduled appointment. *See id.*

281.  Milani submitted all documents required of him prior to his scheduled fingerprinting appointment date. Accordingly, he was fingerprinted on October 2, 2023, at which time his application status in the online portal was changed to "Investigation."

282.  However, the License Division unnecessarily and unjustifiably delayed his application beyond that date, as they failed to assign an investigator or investigate the application for more than one year.

283.  More than one year had passed since he first submitted his application, and Milani had still not heard from the License Division regarding his application. Accordingly, on the one-year anniversary of his fingerprinting appointment, he reached out to the Concealed Carry Unit to inquire. *See id.* at 5. He noted the one-year mark since his application status was modified to

---

[26] Milani inadvertently selected "Concealed" rather than "Special" Carry. His investigator recognized that inadvertence, and switched the license type to one for a Special Carry. Milani's error in this respect did not delay his application even by one day.  noted that his license would be one for a Special Carry. However, he was issued a Concealed Carry approval and license number

"Investigation," and asked for a status update regarding the application. *See id*. He never received a response to that email.

284.  Nine days later, on October 10, 2024—fourteen months after Milani submitted his application, and more than one year after his application entered "Investigation," an investigator finally reviewed his file and reached out to him via email. *See id.* at 6.[27]

285.  While Milani's application was missing certain documents, the License Division's standard practice is to have an investigator review an applicant's file and allow the applicant additional time to submit the outstanding documents. Had an investigator reviewed Milani's file in a timely manner after the application was submitted, Milani could have and would have supplied the requested documents at that time. And indeed as described below, Milani supplied all requested documents promptly after they were requested.

286.  Despite only reviewing Milani's application more than fourteen months after it was submitted, the assigned investigator—PO Samantha Imbembo, advised Milani the following: "You will have 10 business days to submit the above listed items. Failure to do so may result in your application being denied. Again, your deadline will be ***Thursday, October 24, 2024.***" *See id.*

287.  Milani responded almost immediately and provided some of the requested documents and information, and he supplied additional documents early the next morning. PO Imbembo responded five days later—on October 16, 2024, requesting certain updates, which Milani provided early the next day. Not hearing back, Milani reached out on October 21, 2024 seeking to confirm that all required documents were submitted given that his "deadline is approaching," and PO Imbembo responded one day later advising that everything was received.

---

[27] In this email, the investigator correctly noted that the application was one for a Special Carry.

288.  On October 23, 2024—one year, two months, and 21 days after he submitted his application, Milani's application for a Concealed Carry Handgun License was finally approved. *See id.* at 7-9 (Approval Notice intentionally omitted herein).

289.  As a non-City resident applying for a City license, Milani was merely seeking to carry the handguns listed on his Suffolk County license within City limits. Indeed, when his investigator reached out to him via email, she asked him to submit photographs of the handguns he already owns which he wanted listed on his City license. *See id.* at 6. Accordingly, upon his approval, nothing more was required of Milani and the License Division should have simply issued and mailed his license.

290.  However, to avoid any potential delays, and in complying with the instructions Milani had received, *see id.* at 8, he emailed photographs of his handguns and safe to the Purchase Authorization Unit the day after he received his Notice of Application Approval. *See id.* at 10-11. Eleven days later, on November 4, 2024, he receive an email from the License Division acknowledging his submission. *See id.* at 11-12.

291.  Weeks passed, and Milani still did not receive his license. Accordingly, he followed up via email on November 19, 2024, *see id.* at 13, and again on December 9, 2024. *See id.* at 14. But he never received a response to either email. He also tried calling the License Division to during that timeframe to inquire. But he was never able to speak with anyone as no one seemed to be answering the phones.

292.  On December 18, 2024, his attorney sent a letter via email to the License Division regarding Milani's outstanding handgun license. *See id.* at 15. That letter provided a timeline of Milani's application and the License Division's failure to comply with their statutory mandate. The letter expressly requested that the License Division promptly act upon Milani's application

and issue the license he applied for so that he can exercise the rights guaranteed to him by the United States Constitution. *See also id.* at 16.

293.  After several additional inquiries via email, Insp. Bogle emailed Milani on January 31, 2025, advising as follows: "License will be mailed out with that firearm Glock 48 on it." *See id.* at 15. But that was the wrong handgun, and Milani does not own a Glock 48. Indeed in his October 10, 2024 response to PO Imbembo, Milani identified a Glock 43x and a Beretta 80x as the handguns he wanted listed on his City license. *See id.* at 6. Milani responded to Insp. Bogle's email immediately to correct that information. *See id.* at 16.

294.  On February 6, 2025—one year, six months, and four days after he first submitted his application, and three months and 15 days after his application was approved, Milani finally received his Special Carry Handgun License. But it contained the wrong handgun information. While the first entry—as to the Glock 43x, was correct, Milani's license listed a Beretta 1935, Serial No. 6XXXX5, Caliber 32, in place of the Beretta 80x.

295.  On behalf of Milani, his attorney reached out to the License Division, again, noting the error. On February 11, 2025, the License Division Help Desk responded, advising that the Issuing and Purchase Authorization Unit would reach out directly to Milani to correct the issue. As of February 24, 2025, Milani has not heard from them, nor has he received his corrected license.

296.  Accordingly, despite being approved to carry handguns within the City, Milani cannot yet fully exercise his Second Amendment rights as he has not yet received his corrected license.

297.  And at no time—from when he first submitted his application until the date of this filing, did the License Division notify Milani, in writing or otherwise, that "good cause" existed as to his application in particular to justify delaying his application and license.

## PAYSACH A. BURNES

298.  Burnes is a City resident.

299.  On October 16, 2023, he submitted an application for a Concealed Carry Handgun License with the NYPD via its online portal.

300.  When he submitted his application, he attached all documents he was required to submit at the time. On that date, he also paid the required $340 application fee via credit card, *see* Ex. F at 1 (Burnes application documents), and he was issued an application number immediately. *See id.* at 2.

301.  However, the License Division delayed his application by several months, as they only emailed to schedule his fingerprinting appointment three months later—on January 17, 2024. *See id.* at 3-4. That email advised that Burnes's fingerprinting appointment was scheduled for February 8, 2024—which was almost four months since he submitted the application. *See id.* at 3.

302.  The email scheduling the fingerprinting appointment advised that Burnes's application was missing mandatory documents, and that he was required to submit them, along with the Interview Questionnaire, prior to his scheduled appointment date. *See id.* Specifically, the attached checklist directed him to submit his social security card, lifetime DMV abstract, and four character reference letters, which were not requested at the time Burnes submitted his application. *See id.* at 6-7.

303.  Burnes submitted the lifetime DMV abstract on January 21, 2024, the Interview Questionnaire on January 28, 2024, and the last of the reference letters on February 6, 2024. On February 6, 2024, he responded on the email chain which scheduled his appointment to advise that all documents were uploaded to the portal. *See id.* at 5.

66

304.  When Burnes appeared for his scheduled fingerprinting appointment, the member of the License Division who reviewed his packet expressly advised that all required documents were received. Burnes asked how long it would take to hear back from the License Division, and that individual advised that it could take at least another six-to-twelve months.

305.  On February 6, 2024, shortly after completing his fingerprinting, Burnes's application status in the online portal was changed from "Submitted" to "Investigation."

306.  However, over the course of the following months since then, no investigator reached out to him and he did not receive any updates or other communications from the License Division.

307.  Accordingly, he tried calling the Handgun Section several times between June and August, hoping to inquire as to the status of his application. But he was never able to speak with anyone as no one seemed to be answering the phones. He also tried calling the Rifle/Shotgun Section as he was told that individuals have better luck getting someone on the phone there. And while someone did answer the phone, they merely advised him to try calling the Handgun Section again.

308.  Burnes therefore tried emailing to inquire. On August 7, 2024—after his application had been pending for almost ten months, and his application had been in "Investigation" for six months, Burnes emailed various individuals at the License Division—including Insp. Bogle, to inquire. *See id.* at 8. He noted the date he submitted the application and the date he was fingerprinted, and advised that he did not yet hear from an investigator. *See id.* He did not receive a response to that email.

309.  Burnes followed up again on August 19, 2024, and this time noted Penal Law § 400.00(4-b)'s statutory six-month deadline. *See id.* He received a response from Inv. Cohen 12 minutes later, advising that Inv. Paul Kim was assigned to his application. *See id.* at 9.

67

310.  Burnes waited to hear from his investigator. But after another month passed with no communications from the License Division, he tried calling Inv. Kim at the phone number Inv. Cohen had provided. No one answered the phone.

311.  Finally, on November 4, 2024—more than one year after Burnes submitted his application, Inv. Kim called and asked him to submit an 'updated' utility bill as the one Burnes previously supplied was no longer current. Immediately thereafter, Inv. Kim emailed Burnes to memorialize the call, and Burnes supplied the 'updated' utility bill two minutes later. *See id.* at 10.

312.  On November 11, 2024—one year and 25 days after he submitted his application, Burnes's application for a Concealed Carry Handgun License was finally approved. *See id.* at 11. Although his portal status was updated to "Approved" on November 11, 2024, and he received his Notice of Application Approval that day via email, *see id.* at 12, it was apparently pre-dated to November 4, 2024.

313.  Burnes purchased his handgun on December 6, 2024, and paid for and submitted to a NICS check on that date. On December 8, 2024—within the 72-hour window to email the Purchase Authorization Unit, and within the contemplated statutory 30-day window to complete the Purchase Authorization process, he emailed the required documents and photos to the email address indicated on his Purchase Instructions. *See id.* at 13-17.

314.  Burnes did not receive an acknowledgement to his submission. Accordingly, he followed up via email on December 30, 2024. *See id.* at 17-18. He listed his handgun's make, model, serial number, and caliber, as well as additional information, within the body of his email, and he reattached the documents and photos he previously supplied. *See id.* Not hearing back, he duplicated this email to Insp. Bogle, as well as PAA Lynette Spears who works in the Purchase

Authorization Unit, on January 8, 2025, and advised that he had previously emailed this information to the Purchase Authorization Unit. *See id.* at 19 (duplicate attachments omitted herein).

315.  Burnes never heard from anyone. However, his license status was updated from "Issue Pending" to "Active" on January 14, 2025, it was mailed on January 16, 2025, *see id.* at 20, and he finally received it on January 18, 2025—one year, three months, and two days after he first submitted his application, and one month and 10 days after he emailed all required documents and photos to the Purchase Authorization Unit.

316.  Despite this lengthy delay, and despite Burnes having reached out to inquire numerous times, at no time—from when he first submitted his application until the date he received his license, did the License Division notify Burnes, in writing or otherwise, that "good cause" existed as to his application in particular to justify delaying his application and license.

### JASON M. TSULIS

317.  Tsulis is a City resident.

318.  On November 26, 2022, he submitted an application for a Premise Residence Handgun License with the NYPD via its online portal.

319.  When he submitted his application, he uploaded all application documents which were required of him at the time and requested in the online portal

320.  On that date, he also paid the required $340 application fee via credit card, *see* Ex. G at 1 (Tsulis application documents), and he was issued an application number immediately. *See id.* at 2.

321.  The License Division unreasonably delayed his application at the outset, as they did not email Tsulis to schedule his fingerprinting appointment for more than five months.

322.  On May 4, 2023, Tsulis finally received an email notifying him that his fingerprinting appointment was scheduled for May 19, 2023. *See id.* at 3. That email also advised that mandatory documents were missing from his application which he was required to submit prior to appearing for his fingerprinting appointment. *See id.*

323.  Tsulis uploaded the last of his outstanding documents by May 16, 2023. Indeed, when he appeared for his scheduled appointment, he was expressly advised that all required documents were submitted and that nothing more was needed from him. He was also told that he would receive an update via email or telephone.

324.  He was fingerprinted on May 19, 2023, at which time his application status was changed from "Submitted" to "Investigation."

325.  By May 30, 2023, Tsulis had not yet heard from the License Division. He therefore responded to the email which had scheduled his fingerprinting appointment to inquire, and he was advised that his application was in the queue to await the assignment of an investigator. *See id.* at 4.

326.  In the interim, Tsulis changed addresses. He uploaded all documents to reflect the address–including a new utility bill, to the portal. However, the portal does not allow an applicant to change their associated address, and Tsulis wanted to update that information with the License Division. But he could not find any information on how to do so on the License Division's website. He also tried calling the License Division—at several different extensions on various dates. But he could not get through to anyone as no one seemed to be answering the phones.

327.  He reached out again to inquire on July 19, 2023, *see id.* at 2, but he did not receive a response. On July 22, 2023 he reached out again, once again emailing the individual who had

initially scheduled his fingerprinting appointment. *See id.* at 6. He indicated the dates he applied

and was fingerprinted, noted that 61 days had passed since his fingerprinting appointment, and

advised that he still did not hear from anyone regarding the status of his application. *See id.*

Tsulis also asked how he could go about updating his address, as there was no such option online

and no one picks up the phone. *See id.*

328.  He received a response two days later, noting that his application was currently in the

queue to await the assignment of an investigator, and that "[t]here is no estimated time of how

long it will take to be assigned an investigator at this time. You will be contacted via email

and/or telephone call when you are assigned an investigator." *Id.* The officer who responded did

however ask Tsulis to provide his new address, and advised that he would notate it on his file.

*See id.* Tsulis immediately provided his address, and the officer advised that "we have updated

our records to show that you have a new address of . . . You will not be able to see this change,

but upon approval of your license, it will reflect the correct address." *Id.* at 7.

329.  But an additional three months had passed, and Tsulis still did not hear from an

investigator. Nor did he receive any updates or other communications from the License Division

regarding his application. He therefore reached out again via email, on October 23, 2023, this

time to the Handgun Section's New Application Intake Unit. *See id.* at 8. He provided the dates

he submitted the application and his fingerprints, noted how many days had passed since those

events, and asked for an update on the status of his application. *See id.* He did not receive a

response to that email.

330.  Tsulis never heard from an investigator, but on November 30, 2023—one year and four

days after he applied, his application status was updated to "Approved." *See id.* at 9.

331.  Tsulis received his Notice of Application Approval, which was dated December 12, 2023, via regular mail on December 14, 2023—but despite having been assured that his address on file was changed with the License Division, it was sent to his old address. Concerned that his license would also be sent to the wrong address, he called the License Division, and this time someone did answer the phone. He was directed to reach out via email, and he did so immediately. *See id.* at 10.

332.  Tsulis had preordered his handgun upon learning that his application was approved, and he received all necessary documents and photos to process the license from the FFL on December 19, 2023. He emailed the documents and photos to the Issuing and Purchase Authorization Unit via email as required, the same day.

333.  Not having received confirmation of his submission, Tsulis emailed to inquire on December 28, 2023, and he received a response the following day confirming that all documents were received.

334.  On January 4, 2024, Tsulis received an email from SPAA Gibson, inquiring as to which of the two addresses on file was the correct one. *See id.* at 16-17. Tsulis responded immediately and confirmed his address, *see id.* at but the envelope bearing his license was only postmarked five days later—on January 9, 2024. *See id.* at 19-20.

335.  Tsulis finally received his Premise Residence Handgun License on January 12, 2024— one year, one month, and six days after he first submitted his application.

336.  Despite this lengthy delay, and despite Tsulis having reached out to inquire numerous times, at no time—from when he first submitted his application until the date he received his license, did the License Division notify Tsulis, in writing or otherwise, that "good cause" existed as to his application in particular to justify delaying his application and license.

337.  Since receiving his Premise Residence Handgun License, Tsulis applied, and was approved, for both a Concealed Carry Handgun License and Rifle/Shotgun Permit. But as with his Premise application, his subsequent applications were also delayed.

338.  On January 15, 2024, Tsulis submitted a Concealed Carry Handgun License application via the online portal and he annexed all documents required of him at the time.[28] According to his online portal, the application was miraculously approved four-and-a-half months later—on April 29, 2024.

339.  Despite that, the License Division did not issue his Notice of Application Approval.

340.  Due to an upcoming trip to a Constitutional Carry State, Tsulis was hoping to already have his Concealed Carry license, and therefore he reached out to the License Division several times by phone and email to inquire. Tsulis did finally receive his Approval Notice—and indeed he received three of them. The first dated was May 21, the second was dated April 29, and the third was dated May 24, 2024.

341.  On May 22, 2024, Tsulis purchased his handgun, and then submitted all required documents and photos to the Issuing and Purchase Authorization Unit via email as required. But despite following up to inquire, he did not receive a response, nor did he receive his license.

342.  Tsulis ultimately filed an Article 78 Petition on July 9, 2024, and the City was served on July 11, 2024. The Petition was thereafter emailed to the License Division command, and on July 24, 2024, the License Division Director called Tsulis and asked if he wanted to pick up his license in person or have them mail it to his address.

---

[28] Plaintiff recognizes that due to the settlement stipulation entered in the Article 78 Petition pertaining to this license, he cannot, and therefore does not, bring a claim pertaining to delays with his Concealed Carry Handgun License application.

343.  Being wary of potential errors with his license as others have reported in the past, Tsulis scheduled an appointment to retrieve his license in person the next day. He was not disappointed.

344.  The license that awaited him did have his name on it, but someone else's photo. And the handgun he had requested to have listed on that license was missing entirely. Disturbingly, the envelope in which the license and Purchase Authorization were placed in had the wrong address, and if it had been mailed, someone else would have been given essentially all the tools needed to simply go to the FFL and retrieve Tsulis's handgun. A new, and corrected, license was printed for Tsulis on the spot. And yet, the License Division mailed him *another* license the next day—the envelope's address was correct this time, but Tsulis's name was misspelled on the license.

345.  Tsulis's Rifle/Shotgun Permit application was also delayed.

346.  On February 1, 2024, Tsulis submitted a Rifle/Shotgun Permit application with the NYPD via its online portal.

347.  When he submitted his application, he uploaded all required documents, and nothing additional was outstanding.

348.  On that date, he also paid the required $140 application fee via credit card, *see id.* at 21, and he was issued an application number immediately. *See id.* at 22-23.

349.  Given that all required documents were submitted, and given that Tsulis did not have to submit fingerprints again, his application was ripe for a decision on the day it was submitted.

350.  Tsulis never heard from anyone regarding his Rifle/Shotgun application, however it was only approved on April 29, 2024—the same day his Concealed Carry application was approved. *See id.* at 9. Tsulis only received his Permit almost one month later—on May 23, 2024. *See id.* at

351.  Compared to the excessive delays facing handgun license applications, three months and 22 days may not seem significant.

352.  However, there is no justification for this excessive delay as to a license which is not even required in the rest of the State. And the City itself recognizes that, and acknowledges that the application and issuing process as to a Rifle/Shotgun Permit is, and should be, swift. Only in exceptional circumstances—which did not apply here, do City Rules allow this license to be issued more than 30 days after the application was submitted—it took almost four times that long for Tsulis to receive his Permit, and indeed almost 30 days passed from when he was approved until he finally received it.

353.  Tsulis faced additional delays when he sought to add a new handgun to his Premise Residence Handgun License.

354.  On March 18, 2024, Tsulis purchased a new handgun for his Premise Residence license, and he emailed all required documents and photos to the Issuing and Purchase Authorization Unit that day. *See id.* at 26-27. And the following day, he submitted proof of purchase for the safe he already owns. *See id.* at 27.

355.  Not surprisingly, he did not receive confirmation of his submission, therefore he emailed to inquire on March 25, 2024. *See id.* He did receive a response—from Inv. Smith. But rather than Inv. Smith copying the canned confirmation, she advised Tsulis that he "will have to be a little more patient" as she was still responding to emails which came before his. *See id.* at 27-28.[29]

356.  On April 12, 2024—one month less six days since he submitted the required documents and photos, Inv. Smith finally responded, advising that the 'submission' was 'complete.' *See id.*

---

[29] It probably would have taken the same time and effort to simply acknowledge the submission.

357.  Tsulis did not receive his license by April 18, 2024, and his NICS check expired. He therefore followed up again, requesting that his license and Purchase Authorization be mailed out so that he can take possession of his firearm and exercise his constitutional rights. *See id.* at 29.

358.  In response, on May 8, 2024 he received an identical canned email which Inv. Smith had sent him on April 12, 2024—noting that the submission was complete and that he should reach out if he does not receive his license within 30 business day. *See id.* at 28-29. The email appeared to have been copied and pasted. *See id.*

359.  But apparently, the license had been mailed out on May 7, 2024, and Tsulis received it on May 10, 2024. *See id.* at 30-31.

360.  Tsulis waited two months less eight days to receive his updated license and Purchase Authorization, and he was prohibited from retrieving his handgun until then.

**ALEX BIEN-AIME**

361.  Bien-Aime is a City resident.

362.  On March 10, 2024, he submitted an application for a Concealed Carry Handgun License with the NYPD via its online portal.

363.  When he submitted his application, he uploaded all application documents with one exception—including his Social Security Card, DMV Lifetime Abstract, and character reference letters. Bien-Aime did not upload the Interview Questionnaire, as the License Division does not disclose that requirement.

364.  On that date, he also paid the required $340 application fee via credit card, *see* Ex. H at 1 (Bien-Aime application documents), and he was issued an application number immediately. *See id.* at 2.

365.  Bien-Aime already had an active Rifle/Shotgun Permit, which was approved approximately three months before submitting his current applications. *See id.* at 3. He was therefore not required to submit fingerprints again, and his application status should have immediately been changed to "Investigation."

366.  And given that he uploaded all required documents on the date he submitted the application, his application—with the exception of the Interview Questionnaire, was technically ripe for a decision on March 10, 2024.

367.  But the License Division needlessly and unreasonably delayed the application. Despite having fingerprints on file, the License Division never issued Bien-Aime's "Fee Waiver" email advising that his fingerprints on file would be applied to his current application, and his application lingered in "Submitted" status for months.

368.  Bien-Aime therefore tried emailing the License Division to inquire. On June 14, 2024, he emailed both the Handgun Section's New Application Unit, as well as the Concealed Carry Unit. *See id.* at 4. He provided his application type and number, indicated the date it was submitted, noted that it was still in "Submitted" status, and asked for status update. *See id.* He never received a response to that email.

369.  Eventually, on September 11, 2024—six months and one day from when he submitted his application, the portal status was updated from "Submitted" to "Investigation." *See id.* at 3.

370.  Bien-Aime does not know what prompted that update as he did not receive the "Fee Waiver" email. And because he did not receive that email, he was never directed to submit an Interview Questionnaire, and he did not know one was required. He only learnt of that requirement from other sources on February 25, 2025, at which point he immediately completed that document and uploaded it to the portal.

371.  While Bien-Aime's application finally entered the queue to await the assignment of an investigator, months passed, and he did not hear from an investigator. Nor did he receive any updates or other communications from the License Division.

372.  Accordingly, he attempted to call the License Division numerous times, hoping to inquire as to the status of his application. But he was never able to get through to anyone as no one seemed to be answering the phones.

373.  He also tried emailing again to inquire. On January 14, 2025—which marked ten months and four days since he submitted his application, he once again emailed the Handgun Section's New Application Unit and the Concealed Carry Unit. *See id.* at 4. He noted that ten months had passed since he submitted his application, and asked for an update on the status of his investigation. *See id.* But as before, no one responded to that email.

374.  Despite having fingerprints on file, and having submitted all required documents and information, Bien-Aime still did not receive a decision—he anticipates being approved given that he has an active Rifle/Shotgun Permit from the NYPD and nothing changed since he was approved for that firearms license that would cause his Concealed Carry application to be denied. And as of the date of this filing, his application has been pending for eleven months and 18 days.

375.  Despite this lengthy delay, and despite Bien-Aime having reached out to inquire numerous times, at no time—from when he first submitted his application until the date of this filing, did the License Division notify Bien-Aime, in writing or otherwise, that "good cause" existed as to his application in particular to justify delaying his application.

## SHAWN W. ENG

376.  Eng is a City resident.

377.  On November 21, 2023, he submitted applications for a Concealed Carry and Premise Residence Handgun Licenses with the NYPD via its online portal.

378.  On that date, he also paid the required $340 application fee as to each application, but via eCheck. *See* Ex. I at 1-4 (Eng application documents).

379.  The License Division delayed his application at the outset. He had confirmed that his bank processed both payments on November 22, 2023. However, by December 4, 2023, his application statuses were still listed as "Awaiting Payment." Eng therefore emailed the License Division, advising that his payments were in fact processed successfully. *See id.* at 6.

380.  He received a response email the following afternoon confirming that the License Division received his payments, and his applications entered "Submitted" status at that time. *See id.* at 5. He then also received his application numbers. *See id.* at 7-8.

381.  But the License Division continued delaying the applications. Eng already had an active Rifle/Shotgun Permit, which he had renewed several months prior to submitting his current applications. *See id.* at 9. He was therefore not required to submit fingerprints again, and his application statuses as to both applications should have immediately been changed to "Investigation."

382.  However, months passed, and Eng did not receive the "Fee Waiver" email advising that his fingerprints on file would be applied to his current applications. Accordingly, his online portal did not reflect a change in status as to either application, and they remained in "Submitted" status. Additionally, because Eng did not receive the "Fee Waiver" email, he was

never advised to upload an Interview Questionnaire, and he did not know that this document was required.[30]

383.  Eventually, on May 10, 2024, six months less 11 days since he first submitted his applications, Eng finally received the "Fee Waiver Checklist/Letter" email. *See id.* at 10-13. As the Handgun License Required Documents Checklist which was annexed to Eng's "Fee Waiver" email indicates, no additional documents were outstanding. *See id.*

384.  But the Fee Waiver email did not have a copy of the Interview Questionnaire attached thereto, *see id.*, and Eng's checklist failed to indicate that this document was required. *See id.* at 12.[31] Eng only learnt of his requirement from other sources on September 18, 2024, at which time he obtained a copy of the Interview Questionnaire and immediately uploaded that document to the portal.

385.  Despite the initial delays Eng faced, the License Division continued to delay his applications even more. While Eng's application statuses should have entered "Investigation" at the time his "Fee Waiver" emails were issued, they did not.

386.  Weeks passed. Eventually, on June 20, 2024—approximately seven months after he first submitted his applications, Eng's Concealed Carry application finally entered "Investigation." *See id.* at 9. Given the License Division's unjustifiable delays in advancing the application to that stage, the application did not, and could not, enter the queue to await the assignment of an investigator prior to June 20, 2024. This should have occurred the *day* Eng applied. And despite the Concealed application finally entering "Investigation," Eng's Premise application did not, and it remained in "Submitted" status. *See id.*

---

[30] An Interview Questionnaire is not required as part of a Rifle/Shotgun Permit application.
[31] The Interview Questionnaire is often, but not always, listed under "Other."

387.  Months passed, and no investigator reached out to Eng, and he did not receive any updates or other communications regarding his applications. Accordingly, on September 8, 2024, he emailed the Handgun Section's New Application Intake Unit to inquire. *See id.* at 14. He noted that his application had been in "Investigation" since June 20, 2024, and he asked whether any additional documents were required of him. *See id.* He did not receive a response to that email.

388.  Eng therefore retained an attorney to submit a letter to the License Division regarding his outstanding applications in the hopes that they would be persuaded to advance his Premise application and issue decisions as to both applications, as they were required to do.

389.  On September 20, 2024, an email was sent to the License Division generally, the Handgun Section's New Application Intake, Director Berkovich, Insp. Bogle, and the various Lieutenants at the License Division, requesting that they issue decisions as to Eng's outstanding Concealed Carry and Premise Residence Handgun License Applications. *See id.* at 15.

390.  That same day, the License Division advised that an investigator was assigned to Eng's applications. *See id.* at 16.

391.  Two days later—on September 22, 2024, Eng's Premise application status was changed from "Submitted" to "Investigation," and both applications were approved the next day—ten months and two days after they were first submitted. *See id.* at 17.

392.  Eng received his Approval Notices on September 26 or 27, 2024.

393.  Thereafter, on October 5, 2024, he purchased the handgun for his Concealed Carry Handgun License, and paid for and submitted to a NICS check. Later that day, he emailed all documents necessary to process his Concealed license to the Issuing and Purchase Authorization Unit via email as required. *See id.* at 18-19. Pursuant to the directions in the Firearm Purchase

Instructions, in that submission email Eng also requested an appointment to retrieve his license in person. *See id.* at 19.

394.  He did not receive confirmation of his October 5, 2024 submission, therefore he resubmitted all required documents and photos six days later—on October 11, 2024. *See id.* at 20-21.

395.  On October 12, 2024, Eng purchased the handgun for his Premise Residence Handgun License, and he paid for and submitted to a NICS check. Later that day, he emailed all documents necessary to process that license to the Issuing and Purchase Authorization Unit via email as required. *See id.* at 22.

396.  On October 21, 2024, he finally received an acknowledgment to his October 5, 11, and 12, 2024 emails, confirming that all necessary documents were received. *See id.* at 18-22. Despite Eng's request to retrieve his license in person, those emails advised that they would be mailed via USPS. *See id.* at 18, 20, 22.

397.  Apparently, his licenses and Purchase Authorizations were printed that day, and based upon the post-marked date on the envelope they arrived in, they were mailed out two days later. *See id.* at 23.

398.  On October 25, 2024—eleven months and four days after he submitted his applications, Eng finally received his licenses.

399.  Despite this lengthy delay, and despite Eng having reached out to inquire numerous times, at no time—from when he first submitted his applications until the date he received his licenses, did the License Division notify him, in writing or otherwise, that "good cause" existed as to his applications in particular to justify delaying his applications and licenses.

## MATTHEW C. PLUTA

400.  Pluta is a City resident, and a veteran of the United States Navy.

401.  On October 24, 2023, he submitted an application for a Concealed Carry Handgun License with the NYPD via its online portal.

402.  When he submitted his application, he attached all documents he was required to submit at the time. On that date, he also paid the required $340 application fee via credit card, *see* Ex. J at 1 (Pluta application documents), and he was issued an application number immediately. *See id.* at 2.

403.  However, the License Division delayed his application by several months, as they only emailed to schedule his fingerprinting appointment three-and-a-half months later—on February 8, 2024. *See id.* at 3-4. That email advised that Pluta's fingerprinting appointment was scheduled for February 29, 2024—which was more than four months since he submitted the application. *See id.*

404.  The email scheduling the fingerprinting appointment advised that Pluta's application was missing mandatory documents, and that he was required to submit them, along with the Interview Questionnaire, prior to his scheduled appointment date. *See id.* The documents referenced as outstanding had not been requested at the time Pluta initially submitted his application. Nonetheless, he uploaded all additional documents required of him prior to appearing for his scheduled appointment.

405.  When Pluta appeared for his fingerprinting appointment on February 29, 2024, no additional documents were requested of him, and he was fingerprinted on that date.

406.  Accordingly, as reflected in the online portal, his application status was changed from "Submitted" to "Investigation" on February 29, 2024. *See id.* at 5.

407. However, over the course of the following months since then, no investigator reached out to him and he did not receive any updates or other communications regarding his application.

408. He therefore called the License Division to inquire as to whether an investigator was assigned to his application. And while someone did answer the phone, he would not provide Pluta with that information.

409. By May 2024, more than six months had passed since Pluta first submitted his application. He therefore retained an attorney to write to the License Division regarding his outstanding application in the hopes that they would be persuaded to issue a decision as to his application as they were required to do.

410. On May 6, 2024, an email was sent to the License Division generally, the Handgun Section's New Application Intake, Insp. Bogle, and the various Lieutenants at the License Division, requesting that they issue a decision as to Pluta's Concealed Carry Handgun License Application. *See id.* at 6. No one reached out to Pluta in response to that email, but his online portal account reflects that something was modified the following day (it does not indicate what). *See id.* 7.

411. Not receiving any further communications, Pluta again retained an attorney and filed an Article 78 Petition on June 14, 2024, seeking to compel the City to issue a decision as to his outstanding Concealed Carry application.

412. The City, Insp. Bogle, and the various lieutenants at the License Division were served on June 21, 2024.

413. On July 1, 2024, Pluta's application status was changed from "Investigation" to "Approved." *See id.* at 8. However, according to the post-marked date on the envelope it arrived in, the Notice of Application Approval was only mailed out on July 12, 2024.

84

414.  Pluta received his Approval Notice a few days later.

415.  He already owns a licensed handgun in another state, and rather than purchasing a new handgun to carry within the City, he requested to have the one he already owns listed on his City license.

416.  Immediately upon approval, and prior to receiving his Approval Notice, Pluta reached out to the Purchase Authorization Unit and submitted the documents necessary to process his City license with his out-of-State handgun.

417.  On July 31, 2024, the License Division issued Pluta's license, and, according to the post-marked date on the envelope it arrived in, the License Division mailed it to him the next day. *See id.* at 9.

418.  Pluta finally received his Concealed Carry Handgun License on August 5, 2024—nine months and 12 days after he first submitted his application.

419.  Despite this lengthy delay, and despite Pluta having reached out to inquire numerous times, at no time—from when he first submitted his application until the date he received his license, did the License Division notify him, in writing or otherwise, that "good cause" existed as to his application in particular to justify delaying his application and license.

## THOMAS YU

420.  Yu is a City resident.

421.  On July 21, 2023, he submitted an application for a Concealed Carry Handgun License with the NYPD via its online portal.

422.  When he submitted his application, he attached all documents he was required to submit at the time. On that date, he also paid the required $340 application fee via credit card, *see* Ex. K

at 1 (Yu application documents), and he was issued an application number immediately. *See id.*
at 2.

423.  Yu already had an active Premise Residence Handgun License and Rifle/Shotgun Permit,
and he was not required to submit fingerprints again. *See id.* at 3. Accordingly, his application
entered "Investigation" the day he applied, *see id.*, and it was ripe for a decision that day.
However, over the course of the following months, he did not hear from an investigator, nor did
he receive any update or communications from the License Division regarding his application.

424.  Here therefore emailed to inquire on September 24, 2024, *see id.* at 4, but he did not
receive a response.

425.  Yu also tried calling the License Division to inquire, and while he could not initially get
through to anyone, someone did answer the phone on April 8, 2024. On that date, which was
almost nine months after he submitted his application, he was expressly advised that an
investigator was not yet assigned. And when he asked when, approximately, an investigator
would be assigned, he was expressly advised that they are generally not assigned for a period of
6-9 months after entering "Investigation."

426.  Given that no progress had been made on his application since the day he applied, and it
was apparent that there would be no movement as to the application in the foreseeable future, Yu
retained an attorney to write to the License Division regarding his outstanding application in the
hopes that they would be persuaded to issue a decision as to his application as they were required
to do.

427.  On April 10, 2024, an email was sent to the License Division generally, the Handgun
Section's New Application Intake, Insp. Bogle, and the various Lieutenants at the License

Division, requesting that they issue a decision as to Yu's outstanding Concealed Carry Handgun License Application. *See id.* at 5.

428.  An investigator was assigned to Yu's application the next day and requested an 'updated' utility bill, he was then approved, and he received his Concealed Carry Handgun License on April 19, 2024—nine months less two days later.

429.  Despite the lengthy delays as to the application, and despite Yu having reached out to inquire several times, at no time did the License Division notify him, in writing or otherwise, that "good cause" existed as to his applications in particular to justify delaying his application and license.

430.  Eventually, Yu wanted access to a second handgun, and he purchased a new handgun for his Concealed Carry license on January 15, 2025.

431.  As required, he attempted to email the necessary documents to the Issuing and Purchase Authorization Unit via email on the day he made the purchase. But his emails kept bouncing back. *See, e.g. id.* at 6-8. His third attempt—on January 31, 2025, was finally successful and his email went through. *See id.* at 9-11.

432.  Wanting to ensure that the documents were in fact received, he called the Issuing and Purchase Authorization Unit several times, and he spoke with SPAA Gibson on February 13, 2025. Gibson advised that the updated license would be mailed out that day.

433.  After more than a week had passed and Yu still did not receive his license, he called back out of concern that his license was mailed to the wrong address (as other licensees have reported to be the case). Gibson advised that Yu could pick up his license in person if he'd like, and an appointment was scheduled for February 26, 2025.

434.  Yu headed to 1 Police Plaza. But as soon as he got off the train, he received a voicemail advising that his license had arrived in the mail. According to the post-marked date, it was only mailed on February 24, 2025. *See id.* at 12.

435.  Yu waited one month and 11 days to receive his updated license and Purchase Authorization, and he was prohibited from retrieving his handgun until then. And of course by the time he received his updated license, his NICS check had already expired and he was required to pay for another check.

## DARREN ZOU

436.  Zou is a City resident.

437.  On June 17, 2024, he submitted an application for a Concealed Carry Handgun License with the NYPD via its online portal.

438.  On that date, he also paid the required $340 application fee via eCheck. *See* Ex. L at 1-2 (Zou application documents).

439.  The License Division delayed his application at the outset. They only processed his payment, marked his application "Submitted," and issued his application number more than three weeks later—on July 9, 2024. *See id.* at 3.

440.  The License Division continued delaying the application. Almost four months had elapsed since Zou submitted his Concealed Carry application, and he had not yet received the email scheduling his fingerprinting appointment. Accordingly, he attempted to contact the License Division several times, hoping to inquire as to the status of his application. But he was unable to speak with anyone as no one seemed to be answering the phones.

441.  In the interim, on October 8, 2024, Zou submitted a Rifle/Shotgun application via the online portal and paid the required $140 application fee, but by credit card. *See id.* at 4-5.

442. 13 days later, on October 21, 2024, Zou received an email from the Rifle/Shotgun Section scheduling his fingerprinting appointment for the following week—October 28, 2024. *See id.* at 6-10.

443. That email contained a checklist noting the documents which were required for the various licensing applications, and it also advised Zou to complete and upload the Interview Questionnaire. *See id.* With the exception of the Interview Questionnaire—which Zou was now being asked to submit for the first time, he had uploaded all required documents when he first submitted the applications, and nothing was outstanding.

444. However, blatantly contrary to 38 RCNY § 5-03(a)(1), which permits two of the four required reference letters to be submitted by family members,[32] the License Division's email advised that four letters must be submitted which "cannot be from a family members or blood relatives [sic]." *See id.* at 8.

445. Zou uploaded the Interview Questionnaire the following day. And given that one of his reference letters had been submitted from a family member, he subsequently obtained and uploaded a fifth reference letter.

446. Zou had uploaded a copy of his Social Security Card to the portal when he initially submitted his application. However, when he appeared for his fingerprinting appointment, he was asked to resubmit that document, and he provided a hard copy while there. He was then expressly advised that no additional documents were outstanding, and he was fingerprinted on his appointment date.

---

[32] The rule provides as follows: "*References.* The applicant must submit a minimum of four (4) character references who can attest to the applicant's good moral character and that the applicant has not engaged in any act or made any statement that suggests the applicant is likely to engage in conduct that would result in harm to themself or others. Two (2) of these references must be non-family members."

447.  Despite that, the License Division continued delaying Zou's applications by an additional three weeks, as his applications were only advanced to the "Investigation" phase almost three weeks later—on November 16, 2024. *See id.* at 11. That date was just one month shy of the License Division's statutory six-month deadline to act upon Zou's Concealed Carry application. However, his application only entered the queue to await the assignment of an investigator then.

448.  And since then, no investigator reached out to Zou, and he did not receive any updates or other communications regarding his applications. He therefore tried calling the License Division again, once again hoping to inquire as to the status of his applications. Initially, as before, he was unable to get through to anyone as no one answered the phones. After several attempts, someone answered the phone at the Rifle/Shotgun Section on January 2, 2024. Zou was then told that the investigator assigned to his Rifle/Shotgun application was out on vacation. He was also told that, despite his Concealed Carry application having been submitted more than six months prior as of that date, an investigator was not yet assigned.

449.  Zou therefore retained an attorney to submit a letter to the License Division regarding his outstanding applications in the hopes that they would be persuaded to issue decisions as to his applications as they were required to do.

450.  On January 6, 2025, an email was sent to the License Division generally, the Handgun Section's New Application Intake, Director Berkovich, Insp. Bogle, and the various Lieutenants at the License Division, requesting that they issue a decision as to Zou's Concealed Carry Handgun License Application. *See id.* at 13.

451.  Zou received a call from the License Division the next day, asking him to submit an updated driver's license—which was not required of him.[33]

---

[33] Zou had changed addresses while his application was pending. Therefore, on December 21, 2024, he uploaded to the portal all documents which were *actually* required to process an address change—new Affidavits of Co-

452.  Two days later, on January 9, 2025, his online portal statuses as to both applications were updated from "Investigation" to "Approved." *See id.* at 14. That day, he also received his Notice of Application Approval and accompanying Firearm Purchase Instructions as to the Concealed Carry application via email. *See id.* at 15-16.

453.  Zou purchased his handgun and paid for and submitted to a NICS check the following day—January 10, 2025.

454.  That day, he submitted all documents needed to process his license and Purchase Authorization, to the Issuing and Purchase Authorization Unit via email as required. *See id.* at 17-18.

455.  Zou finally received his Rifle/Shotgun Permit in the mail on or about January 22, 2025—three months and fourteen days after he first submitted the application.

456.  And he finally received his Concealed Carry Handgun License on February 10, 2025—seven months and 23 days after he first submitted the application.

457.  Despite this lengthy delays as to both applications, and despite Zou having reached out to inquire regarding the status of his applications and whether anything more was needed of him, at no time—from when he first submitted his applications until the date he received his permit and license, did the License Division notify him, in writing or otherwise, that "good cause" existed as to his applications in particular to justify delaying his applications and license or permit.

### MENACHEM M. BENSINGER

458.  Bensinger is a City resident, and an attorney admitted to practice law in the State of New York.

---

Habitant, an updated utility bill, and the License Amendment Request Form (which was technically not yet required of Zou as he was not yet a Licensee). *See id.* at 12. Neither an applicant nor a licensee is required to submit a driver's license to prove, or update, residency.

459.  He had previously applied for a Rifle/Shotgun Permit, which was approved on April 1, 2024. *See* Ex. M at 1 (Bensinger application documents).

460.  Wanting to submit a Premise Residence Handgun License application, he reviewed the application instructions posted on the License Division's website. The New Application Instructions expressly provide that if one "currently ha[s], or have ever had, a license or permit from the New York City Police Department License Division and [they] wish to apply for an additional handgun license or rifle/shotgun permit, [they] *must* contact the License Division at (646) 610-5551 for further instructions before registering your account." *See* Ex. A at 1.

461.  Beginning in early or mid-June, 2024, Bensinger attempted to call the posted number, but he was unable to get through to anyone as no one seemed to be answering the phone. And while he left several messages, he never received a return all.

462.  After several weeks passed and he was still unable to speak with anyone, he tried calling other extensions at the License Division, and on July 23, 2024 an officer answered the phone.

463.  Bensinger explained the reason for his call, and advised that he was unable to get through to anyone as the designated number listed on the New Application Instructions. The officer responded stating words to the effect of, "I hear you about the delays and no one answering when you call, what can I say, it's the NYPD." The officer told Bensinger that he would email him an 'interview packet,' and that once Bensinger submits it, the officer would move the application into the 'no fingerprinting needed' pile.

464.  Immediately following that phone call, Bensinger received a copy of the Interview Questionnaire via email, *see id.* at 3, and he then began compiling the required application documents.

465. On July 30, 2024, he submitted an application for a Premise Residence Handgun License with the NYPD via its online portal.

466. On that date, he also paid the required $340 application fee via eCheck. *See id.* at 4-5.

467. And significantly, on July 30, 2024, Bensinger uploaded every necessary document to his online portal—including his Interview Questionnaire. And because he already had fingerprints on file from his prior Rifle/Shotgun application, his Premise Residence application was ripe for a decision on the day he applied.

468. Bensinger emailed the officer the following day to advise that he submitted his application, and, as per their prior telephone call, asked that it be marked as not needing fingerprinting. *See id.* at 2-3. The officer advised that he could not make changes to the application until the payment posts. *See id.* at 2.

469. But the License Division delayed the application at the outset. They only processed Bensinger's payment, marked his application "Submitted," and issued his application number two weeks later—on August 13, 2024. *See id.* at 6. And Bensinger emailed the officer one hour later to advise of that fact. *See id.* at 2.

470. Three days later—on August 19, 2024, Bensinger's application status was updated from "Submitted" to "Investigation," and the officer emailed to advise that he "took care of print waiver and completed intake." *See id.*

471. But by December 2024, Bensinger's application was still in "Investigation," therefore he emailed the officer again to inquire. *See id.* He did not receive a response to that email.

472. On February 6, 2025—six months and seven days after he submitted his Premise application, Bensinger's application was approved. *See id.* at 1. And he received his Notice of Application Approval via email minutes later. *See id.* at 7-8.

473.  Thereafter, on February 12, 2025, Bensinger purchased his handgun and submitted all required documents and photos to the Issuing and Purchase Authorization unit via email. *See id.* at 9-10. But he never received confirmation of his submission.

474.  Since then, he emailed to inquire several times as to the status of his license—on February 18, 19, 21, and 24, 2025. *See id.* at 11-13. He referenced the statutory six-month deadline to act upon an application, and requested a status update. *See id.* But he never received a response to any of those emails. And as of the date of this filing, his license status is still listed as "Issue Pending," which means it was not yet printed.

475.  Despite the lengthy delays as to the application, and despite Bensinger having reached out to inquire several times, at no time did the License Division notify him, in writing or otherwise, that "good cause" existed as to his applications in particular to justify delaying his application and license.

## **CAUSE OF ACTION**

### **ONE**
### **42 U.S.C. § 1983 – Second Amendment (*Monell*)[34]**

476.  Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

477.  Plaintiffs possess Second Amendment rights to keep and bear arms within City limits, which is subject only to meeting the application requirements established by the State and City. And Plaintiffs diligently attempted take all steps reasonably necessary of them so that they can lawfully exercise those rights.

---

[34] Plaintiffs do recognize that the Second Amendment was made applicable to the states through the Fourteenth Amendment, and that this claim may perhaps more appropriately be listed as a Fourteenth Amendment violation. Therefore, the Jurisdiction and Venue section at the outset of this Complaint notes the Fourteenth Amendment as a basis for this Complaint as well.

478.  However, they cannot, and could not, exercise their constitutional rights within New York City until such time as the New York City Police Department's License Division approves their respective firearms license applications and then issues the licenses they applied for.

479.  However, the License Division maintained a policy and practice of excessively and unjustifiably delaying the processing of firearms license applications and delaying issuing the licenses and Purchase Authorizations to those applications who were in fact approved.

480.  The City, the License Division, and their policy-making officials, knew that without a License and Purchase Authorization an individual cannot exercise their Second Amendment rights to keep and bear arms within City limits. And they knew that the delays which were implemented pursuant to the policy and custom *they* created and maintained, violated applicant's Second Amendment rights.

481.  Despite that, they failed to take action or implement measures to ensure these delays did not continue.

482.  Accordingly, the City and its License Division's policy-making officials acted with deliberate indifference to the violations of applicants' Second Amendment rights.

483.  Plaintiffs all submitted completed applications for New York City handgun licenses. They all paid the required fees, and provided all required documents and information at the appropriate times within their respective application periods.

484.  Plaintiffs fully cooperated with their investigations, and they did not contribute to the delays in their respective application periods.

485.  Despite that, and given the implementation of the City's unconstitutional policy and practice, Plaintiffs' Second Amendment rights were violated during the period in which the

License Division delayed their respective applications, and delayed issuing the licenses and Purchase Authorizations to those who were in fact approved.

**Handgun License Delays:**

486.  The handgun license applications of Plaintiffs Milani, Burnes, Tsulis, Eng, Pluta, Yu, Zou, and Bensinger were all approved, and these Plaintiffs were found to meet the State and City handgun license application requirements.

487.  And while Bien-Aime's application was not yet approved, he anticipates that it will be.

488.  However, given the delays in their respective applications—implemented pursuant to the License Division's unconstitutional policies and practices, Plaintiffs were legally prohibited from keeping and bearing arms within the City from when they applied for their various handgun licenses until such time as they received, and as to Bensinger and Bien-Aime until they receive, their valid City firearms licenses.

489.  Specifically, Milani submitted his application on August 2, 2023, but he only received his (partially incorrect) license on February 6, 2025—**one year, six months, and four days** later. He is *still* waiting to receive is corrected license accurately listing the handguns he applied to be able to carry within the City.

490.  Burnes submitted his Concealed Carry application on October 16, 2023, but he only received his license on January 18, 2025—**one year, three months, and two days** later.

491.  Tsulis submitted his Premise Residence application on November 26, 2022, but he only received his license on January 12, 2024—**one year, one month, and six days** later.

492.  Bien-Aime's application is still pending. However, because he possesses an active Rifle/Shotgun Permit from the NYPD and nothing as to his personal circumstances changed since that application was approved that would cause his Concealed Carry application to be

denied, he anticipates that his current application will similarly be approved. He submitted his Concealed Carry application on March 10, 2024. And as of the date of this filing, his application has been pending for **eleven months, 18 days, and counting**, and he *still* did not receive a decision. There is no telling when his license will finally be issued.

493.  Eng submitted his Concealed Carry application on November 21, 2023, but he only received his license on October 25, 2024—**eleven months and four days** later.

494.  Pluta submitted his Concealed Carry application on October 24, 2023, but he only received his license on August 5, 2024—**nine months and 12 days** later.

495.  Yu submitted his Concealed Carry application July 21, 2023, but he only received his license on April 19, 2024—**nine months less two days** later.

496.  Zou submitted his Concealed Carry application on June 17, 2024, but he only received his license on February 10, 2025—**seven months and 23 days** later.

497.  Bensinger submitted his Premise Residence application on July 30, 2024, and while his application was approved, his license is not listed as "Active" as of the date of this filing—**seven months less two days** later.

498.  Plaintiffs Milani, Burnes, Tsulis, Eng, Pluta, Yu and Zou's Second Amendment rights were violated during the respective periods noted above, and particularly after their respective applications were approved until they finally received their licenses, specifically because of the License Division's implementation of the City's unconstitutional policies and practices.

499.  Plaintiffs Bien-Aime and Bensinger's Second Amendment rights were, and are still continuing to be, violated, specifically because of the License Division's implementation of the City's unconstitutional policies and practices.

**Rifle/Shotgun Permit Delays:**

500.  Plaintiff Tsulis's Rifle/Shotgun application was approved, and he was found to meet City Rifle/Shotgun application requirements.

501.  However, given the delays with his application—implemented pursuant to the License Division's unconstitutional policies and practices, he was legally prohibited from keeping and bearing a rifle or shotgun within the City from when he applied for his Rifle/Shotgun Permit until such time as he received the Permit.

502.  Specifically, Tsulis submitted his application on February 1, 2024, but he only received his Permit on May 23, 2024—**three months and 22 days** later.

503.  Accordingly, Tsulis's Second Amendment rights were violated during the period in which his application was pending, and particularly after it was approved but before he finally received Permit, specifically because of the License Division's implementation of the City's unconstitutional policies and practices.

**Updated License and Purchase Authorization Delays:**

504.  Plaintiffs Tsulis and Yu had active handgun licenses, and they sought the ability to keep and bear multiple arms—as the plain text of the Second Amendment provides.

505.  Toward that end, Tsulis and Yu paid for an additional firearm each, and paid for and submitted to a NICS check.

506.  However, given the delays by the Issuing and Purchase Authorization Unit—implemented pursuant to the License Division's unconstitutional policies and practices, they were legally prohibited from retrieving their respective handguns until such time as they received their updated handgun licenses and accompanying Purchase Authorizations.

507.  Specifically, Tsulis purchased his additional firearm on March 18, 2024, and on that day, he submitted all documents as required. However, he did not receive his license and Purchase Authorization until May 10, 2024— **two months less eight days** later.

508.  Yu purchased his additional firearm on January 15, 2025, and on that day, he attempted to submit all documents as required, and the submission finally went through on January 31, 2025. However, he did not receive his license and Purchase Authorization until February 26, 2025— **one months and 11 days** later (or 26 days after his email finally went through).

509.  Accordingly, Tsulis and Yu's Second Amendment rights were violated during the period in which they waited to receive their updated licenses and Purchase Authorizations, specifically because of the License Division's implementation of the City's unconstitutional policies and practices.

510.  Should this Court determine that any element or aspect of this Complaint was insufficiently plead, this Court should permit Plaintiffs to amend the Complaint accordingly.

**WHEREFORE**, Plaintiff requests the following relief against the City:

1.  Judgment for the Plaintiffs on their claims;

2.  A trial by jury on all triable issues;

3.  An award of compensatory damages in an amount to be determined at trial;

4.  Disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.  Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
      February 28, 2025

                                    Respectfully submitted,

                                    The Law Office of Mirel Fisch
                                    *Attorneys for Plaintiffs*
                                    2329 Nostrand Ave, Suite 100
                                    Brooklyn, New York 11210
                                    mirel@mfischlaw.com
                                    (929) 382-493

                       By:     _____
                                    Mirel Fisch